## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | ) | Civil Actions No. 02-1201, 03-425, |
| | ) | 03-1380, 05-589, 05-590, 05-688, |
| COMMUNITY BANK OF NORTHERN | ) | 05-1386 and 06-768 |
| VIRGINIA AND GUARANTY BANK | ) | |
| SECOND MORTGAGE LITIGATION, | ) | |

## ADVISORY OPINION

By Order of Court dated January 31, 2007, the undersigned was appointed by the United

States District Court for the Western District of Pennsylvania, as a "friend of the court" to

"evaluate whether the settlement proposed in this civil action is fair and reasonable under

Fed.R.Civ.P. 23(e)," and to render a non-binding advisory opinion setting forth our conclusions.

Following a hearing, oral arguments and extensive briefing by the parties, we conclude that, for

the reasons set forth below, the proposed settlement is fair, reasonable and adequate under

Fed.R.Civ.P. 23(e).

## I. BACKGROUND

The underlying facts and procedural history of this class action are set forth in the

opinion of the Court of Appeals at *In re Community Bank of Northern Virginia*, 418 F.3d 277,

283-293 (3d Cir. 2005), and will not be restated here. For purposes of this advisory opinion, it is

suffice to say that the class action plaintiffs have alleged a predatory and illegal lending scheme,

whereby the Shumway Organization formed associations with several financially distressed

banks, including the defendants, Community Bank of Northern Virginia ("CBNV") and the

Guaranty National Bank of Tallahassee ("GNBT"), for the purpose of circumventing certain

state fee and interest ceilings when offering "high-interest mortgage-backed loans to debt-laden

homeowners." *Id.* at 283. Plaintiffs further alleged that certain fees in the loan settlement

statements included illegal kickbacks to Shumway for services that were not actually rendered. GMAC Residential Funding Corporation ("RFC") is also a defendant to the class action and is essentially alleged to be a co-conspirator by purchasing the loans made by CBNV and GNBT, despite having knowledge that the banks were mere "strawparties" for Shumway's illegal conduct.

The class action began as six separate actions. On July 11, 2003, prior to any discovery taking place, the named plaintiffs in all six actions and defendants CBNV, GNBT and RFC, (collectively, the "Settling Parties"), filed a joint motion with the district court seeking approval of a proposed nationwide class action settlement.[1] Under the terms of the original proposed settlement, the maximum total payout to the approximately 44,000 class members was $33 million, with awards to class members ranging from $250 to $925, contingent on when the loan closed and the borrower's state of residence. The defendants also agreed to pay $8.1 million in attorney's fees. The district court preliminarily approved the proposed settlement, consolidated the six actions into a single action, and conditionally certified the plaintiff class for settlement purposes only. After notice and a fairness hearing, the district court approved the proposed settlement by Order dated December 4, 2003.

A number of law firms and plaintiff class members (the "Objectors") filed an appeal from the December 4 Order challenging, among other things, the fairness of the settlement. The Court of Appeals determined that the district court had not adequately engaged in the Rule 23(a) and 23(b) inquiry required by *Amchem Prods. Inc. v. Windsor*, 521 U.S. 601-602 (1997), and remanded for further proceedings. In so doing, the Court of Appeals found it unnecessary to

---

[1] Mercantile Safe-Deposit & Trust Company is the successor in interest to CBNV and the Federal Deposit Insurance Corporation has been appointed as the receiver for GNBT.

address the issue of whether the settlement was itself fair, reasonable and adequate and left that determination to the district court.

The "lynchpin" of the Objectors' arguments on appeal, and the issue upon which the Court of Appeals devoted most of its focus, was whether the class members had viable and potentially valuable claims under the Truth In Lending Act ("TILA"), as amended by the Home Ownership and Equity Protection Act ("HOEPA"), 15 U.S.C. §1601 *et seq.*, that were not pled in the class action complaint and for which adequate compensation was not provided in the proposed settlement. Accordingly, the district court appropriately determined that the threshold issue on remand was whether any class members had "viable" TILA/HOEPA claims. After extensive briefing and oral argument on the matter, the district court issued a Memorandum, dated October 6, 2006, wherein it concluded that there were no "viable" TILA/HOEPA claims.

Prior to the issuance of the Memorandum, the Settling Parties, with the assistance of third party mediators, engaged in additional settlement discussions. Those discussions culminated in a "modified and enhanced" proposed settlement agreement that was presented to the district court for approval by motion dated August 11, 2006. The modified and enhanced proposed settlement agreement provides class members an additional benefit of $332, if they properly complete a Proof of Claim Form. According to counsel for the Settling Parties, the additional benefit provided is intended to directly address the Court of Appeal's concern regarding the failure to consider possibly viable TILA/HOEPA claims in connection with the initial proposed settlement, and said benefit was specifically allocated as consideration for the hypothetical TILA/HOEPA claims. The revised settlement also required defendants to create a fund for the award of attorney's fees and costs in an amount not to exceed $7.5 million, and limits Class Counsel's fee petition to no more than that amount. Defendants also agreed to pay up to an additional $2

million dollars in attorney's fees and costs to other counsel (presumably the Objectors) if so ordered by the district court.

By Order dated January 31, 2007, the district court appointed the undersigned as a "friend of the court" to evaluate whether the settlement proposed in this matter is fair and reasonable under Fed.R.Civ. P. 23(e)." Notably, the Order requires us to "assume, without deciding, that the class action satisfies the requirements of Fed.R.Civ.P. 23(a) and (b)." Accordingly, our sole focus is whether or not the terms of the settlement are fair, reasonable and adequate pursuant to the teachings of the Court of Appeals in *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975).[2]

## II. LEGAL ANALYSIS

The Objectors have filed an extensive brief exceeding 100 pages in opposition to the proposed modified and enhanced class action settlement, the primary focus of which is the Objectors' assertion that the proposed settlement is neither fair nor reasonable because of the existence of purported valuable TILA/HOEPA claims. Indeed, while the Objectors contend that the settlement should be rejected even if the TILA/HOEPA claims are not viable, they admit that "the viability issue . . . is the key to determining the fairness of the modified settlement." Objectors' Brief, p. 68. However, as rehearsed, the district court has already concluded that there are no viable TILA/HOEPA claims and it is our understanding that we are not to revisit that issue here. Rather, in determining the fairness of the proposed settlement, we will proceed on the assumption that the class members are without viable TILA/HOEPA claims.[3]

---

[2] The undersigned previously served as a private mediator in connection with a dispute between the Settling Parties and counsel representing class members from North Carolina regarding the original proposed settlement. We do not believe that service in that matter in any way compromises our ability to serve as an independent and unbiased "friend of the court" here. Our opinions and findings stated herein have been formed based solely upon the record before us.

[3] We should note that, while criticism of a district court's unfavorable rulings and procedures are common and expected, Objectors' counsel has, in our view, exceeded the bounds of professional conduct by making unwarranted, unnecessary and, quite frankly, silly attacks on the district court in its legal brief. *See,* for example, Objectors' Brief, p. 28 (stating that the district court's off-hand reference at a status conference to a "do over" instead of "start over"

4

In *Girsh*, the Court of Appeals stated that the "decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." *Id.* at 156.  In determining whether a proposed class action settlement is fair, reasonable and adequate, the Court listed some of the factors that are relevant to that determination, including: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *Id.* at 157.  We test the reasonableness and adequacy of the instant proposed settlement by applying each of these factors below.

1.      The Complexity, Expense and Likely Duration of the Litigation

The first *Girsh* factor clearly favors approval of the proposed settlement.  The parties do not dispute that the issues in this case are complex and that litigation would be lengthy and expensive.  The Objectors, however, suggest that this factor is neutral because the proposed settlement is purportedly "inadequate and perhaps collusive." Objectors' Brief, p. 71.  With respect to the former, the adequacy of the settlement is a separate factor that we address below, and, regarding the latter, we, like the other third-party neutrals who have examined the settlement, find nothing in the record to merit the Objectors' claims of collusion. In any event, the issue  whether the class was adequately represented is outside the scope of our authority.

---

manifested the district court's intent to 'grease the skids" of the proposed modified settlement).  These attacks serve only to reduce the civility and decorum of the proceedings, and we strongly encourage Objectors' counsel to abide by the principles set forth in the Pennsylvania Code of Civility in all further proceedings before the district court.

The Objectors further argue that the duration and expense of the litigation are non-factors because the case has already been litigated for years and defendants and the Objectors have sufficient assets to continue the litigation. While this may be true, it does not render these factors irrelevant. First, the fact that the case has already been of long duration does not mitigate the benefit of an early settlement over protracted further litigation, assuming that the settlement is otherwise fair, reasonable and adequate. The same holds true regarding the significant expense of continued litigation - - to the extent such expense can be avoided (on both sides and despite the ability to afford the expense), it favors approval of the proposed settlement.

2.      The Reaction of the Class to the Settlement

We agree with the Settling Parties that the class members reacted strongly in favor of the original proposed settlement agreement as only a small percentage opted-out of the class or objected to the settlement terms.[4] As noted by the Settling Parties, only 16 of the 44,535 person settlement class "who were free of outside influence from plaintiffs' lawyers" opted out of the class. While solicitations by counsel initially resulted in an additional 419 opt outs, after a curative notice by the district court, only 94 of those original opt-outs opted out again, for a total of 110 opt-outs, or less than .25 percent of the total class. Even if we were to deem that all 435 class members properly opted-out, that is still less than one percent of the total class. Moreover, while there were five sets of objections to the proposed settlement filed with the district court (representing approximately 400 class members), three of the sets were prepared by law firms

---

[4] We cannot analyze the reaction of the class to the modified and enhanced settlement because no notice of such settlement has been issued to the class members. The Settling Parties contend that such notice is not mandatory and should not be required by the district court because it is not necessary to protect the absent class members. *See, e.g., Austin v. Pennsylvania Dep't of Corrections,* 876 F.Supp. 1437, 1455 (E.D. Pa. 1995). They assert that, because the modified settlement only increases the benefits to the class, the district court can, in its discretion, waive the notice requirement. Although we seriously doubt that the circumstances of this case fit within the very limited exceptions to the mandatory notice requirement, that issue is not before us and will be decided by the district court. *See* Transcript of December 1, 2006 Status Conference, pp. 14-15, 19-20. Accordingly, our analysis of the instant *Girsh* factor is necessarily based upon the reaction of the class to the original settlement, which we suspect will be representative of the reaction to the modified settlement.

6

that had participated in the so-called "opt-out campaign," one set did not object to the substance

of the settlement, and the fifth set was filed by the Missouri Attorney General and basically

tracked the objections filed by the three law firms. Under these circumstances, we agree with the

district court that the number of objectors did not accurately reflect the true opposition to the

original proposed settlement and, even if it did, the overwhelming majority (98-99%) of the class

members neither opted-out nor objected to the proposed settlement, thus favoring approval of the

settlement. *Shlensky v. Dorsey*, 574 F.2d 131, 148 (3rd Cir. 1978); *MetLife Sales Practices Litig.*,

1999 WL 33957871 (W.D. Pa. Dec. 28, 1999).

The Objectors do not seriously dispute that the number of opt-outs and objectors is

relatively insignificant and would not justify the rejection of the proposed settlement; rather, they

argue that "it is the quality of the objection which counts." Objector's Brief, pp. 72-73. The

"quality of the objections," however, is considered when applying the other *Girsh* factors. With

respect to the reaction of the class, it clearly favors approval of the proposed settlement.

3.      The Stage of the Proceedings and the Amount of Discovery Completed

The settlement in this case was reached at the earliest stages of the litigation, before any

discovery had been conducted. In our view, this fact does not favor approval of the proposed

settlement. *See Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1314 (3d Cir. 1993)("post-discovery

settlements are more likely to reflect the true value of the claim and be fair.").

On the other hand, the Court of Appeals noted that a district court has the discretion to

"employ the procedures that it perceives will best permit it to evaluate the fairness of the

settlement." *In re Community Bank of Northern Virginia*, 418 F.3d 277, 316 (3d. Cir.

2006)(quoting *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F.Supp. 450, 563

(D.N.J. 1997), *aff'd,* 148 F.3d 283 (3d Cir. 1998)). Moreover, the Court of Appeals recognized

that objectors to a class action settlement do not have an absolute right to discovery and that, in

this case, the Objectors, through discovery conducted in two separate civil actions brought in the

state courts of Missouri, were likely able to develop "sufficient facts regarding this matter and its

prospective settlement value such that it would be able to present a cogent and supportable

objection at the fairness hearing." 418 F.3d at 316.  We agree.  As evidenced by the Objector's

filings with the Court, they gathered significant knowledge of the facts that gave rise to the class

claims through the separate lawsuits, related regulatory and other proceedings, and their client

class members.  *See, e.g.,* Objector's Brief, pp. 76-87 (citing to documents and testimony in

support of TILA/HOEPA liability).  While further discovery would no doubt uncover additional

facts that would both support and counter the Objector's arguments, we do not believe that this

case is so factually complicated as to require formal discovery before a fair settlement can be

reached, particularly where most of the predicate facts do not appear to be in dispute and where

the primary areas of disagreement relate to issues of law.  Accordingly, we find that the lack of

formal discovery in this case does not militate against the proposed settlement and we deem this

factor to be neutral with respect to the proposed settlement.

4. - 5.   The Risks of Establishing Liability and Damages

The risks of establishing liability and damages are factors that "survey the potential risks

and rewards of proceeding to litigation in order to weigh the likelihood of success against the

benefits of an immediate settlement." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 537

(3d Cir. 2004).  In our view, such a "survey" by the district court does not require it to make an

exhaustive determination of the merits of all of the claims asserted, or that could have been

asserted, by the class.  Rather, the district court must only determine whether the class would

8

likely face any significant legal or factual obstacles in attempting to establish liability or damages at a trial.

We address first the risk of establishing damages. The only "risk" offered by the Settling Parties is that the class plaintiffs would have to rely upon expert testimony to establish damages and that there is a risk that a jury may not believe or accept that expert testimony. We find this risk, although it may be real, to be minimal, and it clearly would not present a significant barrier to establishing damages. Accordingly, this factor does not favor the proposed settlement.

With regard to the liability risk factor, the main thrust of the Objectors' arguments pertain to the viability of the TILA/HOEPA claims, which we will not address for the reasons previously stated. Rather, we will consider these risk factors in the context of the asserted RESPA, RICO and state law claims only.

a.  RESPA Claims

RESPA provides that:

> No person shall give and no person shall accept any portion, split or percentage of any charge made or received for the rendering of real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

12 U.S.C.A. §2607(b). In this case, the class plaintiffs claim that defendants engaged in a scheme whereby they charged fees for title examinations that allegedly were neither performed nor necessary, and fees for title abstracts that were "marked up" for services that were not provided. Defendants, on the other hand, have proffered evidence (consisting almost exclusively of affidavits by defendant and title company employees) that title examinations were performed on all of the loans at issue, and that the alleged "mark ups" were legitimate costs charged by the title companies for services rendered. *See* Settling Parties' Brief, pp. 39-40.

Based upon the admittedly limited evidence presented, it appears that class plaintiffs face a significant risk that they would be unable to establish RESPA liability because of the inability to prove certain requisite facts; to-wit, that defendants charged fees for services that were not performed. Moreover, it appears that defendants may have valid statute of limitations and statute of repose defenses to the RESPA claims of as many as 30,000 of the 44,000 class members. The relevant limitation provision provides in pertinent part as follows:

> Any action pursuant to the provisions of section 2605, 2607, or 2608 of this title may be brought in the United States district court …within 3 years in the case of a violation of section 2605 of this title and 1 year in the case of a violation of section 2607 or 2608 of this title from the date of the occurrence of the violation ….

12 U.S.C.A. §2614.

Defendants argue that the three-year limitations period for public enforcement claims is a statute of repose that is not subject to equitable tolling, and cite in support thereof *Pedrazza v. United Guar. Corp.*, 114 F.Supp.2d 1347 (S.D. Ga. 2000). Defendants further assert that the one-year limitations period is not subject to equitable tolling. *See Hardin v. City Title & Escrow Co.,* 797 F.2d 1037 (D.C. Cir. 1986). Moreover, defendants contend that, even if plaintiffs could toll the statute by establishing fraudulent concealment, they would each be required to show some affirmative act on behalf of defendants, in addition to the fraudulent acts that provide the factual predicate for the RESPA claim that caused the concealment of the underlying fraud. *See* October 6, 2006 Memorandum, pp. 23-24. Finally, the Settling Parties argue that the individualized inquiries that would be necessary to determine the application of equitable tolling would render the class action unmanageable.

While the Objectors offer significant counter-arguments to each of the defenses raised by defendants, and have also cited to evidence and legal authority to support their arguments, we have reviewed the applicable legal authorities and conclude that, without deciding the merits of

10

these arguments, there is a significant risk that some or all of the class plaintiffs' RESPA claims would fail if this matter went to trial.[5]

      b.     <u>RICO Claims</u>

Defendants argue that the class plaintiffs also face significant liability obstacles that would be fatal to their RICO claims if this matter proceeds to trial.  They contend that, with supporting legal authority, the plaintiffs would be unable to establish two necessary elements of a RICO claim: (i) that RFC participated in the "operation or management" of a RICO enterprise, and (ii) that RFC's participation was through a "pattern of racketeering activity."  In response, the Objectors do not dispute that the class plaintiffs face a significant liability risk with respect to the RICO claims; rather, they contend only that the claims would survive a Rule 12(b)(6) motion and cannot be deemed "throw away" claims for purpose of settlement.

We cannot determine from the record whether or not the class plaintiffs would ultimately be able to prevail on their asserted RICO claims, nor need we do so to determine the fairness of the settlement.  In our view, defendants have posited defenses to the RICO claims that present significant barriers to establishing liability, particularly in view of the Court of Appeals' historically narrow construction of the RICO statute.  In view of the significant risk that plaintiffs' RICO claims would fail if the case went to trial, the proposed settlement is favored.

      c.     <u>State Law Claims</u>

Finally, the Objectors do not seriously dispute that the class plaintiffs face significant liability risks with respect to the state law claims and, indeed, acknowledge that similar claims asserted in related litigation have been dismissed on the basis of preemption.

---

[5] One of defendants' arguments that we can reject as a matter of law is the contention that RESPA liability does not attach unless the challenged fee is "split" among defendants.  Under the controlling law established in *Santiago v. GMAC Mortgage Group, Inc.*, 417 F.3d 384 (3d Cir. 2005), this argument is wholly without merit.

We reject the Objectors' contention that the district court in determining the fairness of a proposed class settlement, must do an exhaustive search of the laws of the various states to determine if there are other state laws upon which certain of the class plaintiffs may be able to assert additional claims. We further reject the objections of counsel for certain North Carolina class members that all North Carolina members should be granted a separate subclass based upon their state law claims. Notably, the same counsel had agreed to accept the substance of the original proposed settlement, which provided North Carolina residents with an additional $325 for settlement of those state law claims. Now, however, counsel deems that same $325 settlement payment, which is likewise part of the modified settlement, to be insufficient.

While we agree that counsel's acceptance of the original proposed settlement does not constitute a waiver of his right to object to the proposed modified settlement, we are not persuaded that North Carolina class members have any greater likelihood of prevailing on their state law claims (or recovering greater damages) than any of the other class members who have or would have similar state law claims. Moreover, class members who have such claims will be compensated through the settlement. Accordingly, we see no reason for creating a subclass of North Carolina class members.

In sum, we find that the risks of establishing liability against defendants on RESPA, RICO and state law claims clearly favors the proposed settlement. The risks of establishing damages, on the other hand, are minimal and, therefore, do not support the proposed settlement.

6.    The Risks of Maintaining the Class Action Through Trial

We conclude that the risks associated with maintaining a class action through trial is a neutral factor in this case. As the Objector's aptly note, this risk factor is "perfunctory" and has "little meaning" in connection with a settlement-only class action. *In re Prudential Ins. Co. of*

12

*Am. Sales Practice Litig. Agent Actions,* 148 F.3d 283, 321 (3d Cir. 1998). Defendants contend

that this factor weighs in favor of the proposed settlement because, with respect to the RESPA

claims, individual issues would allegedly predominate over the common issues. We find little

merit to this argument (other than with respect to the tolling issue addressed above) and, in any

event, the predominance issue is outside the scope of our authority and will be addressed by the

district court as part of its Rule 23(b) analysis.

7.      The Ability of the Defendants To Withstand a Greater Judgment

        This factor is concerned with "whether the defendants could withstand a judgment in an

amount significantly greater than the Settlement." *In re Cendant Corp. Litig.*, 264 F.3d 201, 240

(3d Cir. 2001). Defendants have offered no evidence to establish that CBNV or RFC could not

withstand a greater judgment and it appears, in fact, that they could. Accordingly, this factor

does not favor the proposed settlement.

8. – 9.  The Range of Reasonableness of the Settlement Fund in Light of the Best Possible
         Recovery and the Range of Reasonableness of the Settlement Fund to a Possible
         Recovery in Light of All the Attendant Risks of Litigation

        The eighth and ninth *Girsh* factors seek to determine "whether the settlement is

reasonable in light of the best possible recovery and the risks the parties would face if the case

went to trial." *In re The Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 322 (3d

Cir.1998). In applying these factors, the Court of Appeals has stated:

> In formulaic terms we agree that "in cases primarily seeking
> monetary relief, the present value of the damages plaintiffs would
> likely recover if successful, appropriately discounted for the risk of
> not prevailing, should be compared with the amount of the
> proposed settlement." MCL 2d § 30.44, at 252. This figure should
> generate a range of reasonableness (based on size of the proposed
> award and the uncertainty inherent in these estimates) within
> which a district court approving (or rejecting) a settlement will not
> be set aside. *See Newman v. Stein*, 464 F.2d 689, 693 (2d
> Cir.1972). The evaluating court must, of course, guard against

> demanding too large a settlement based on its view of the merits of
> the litigation; after all, settlement is a compromise, a yielding of
> the highest hopes in exchange for certainty and resolution. *See*
> *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir.1977). The
> primary touchstone of this inquiry is the economic valuation of the
> proposed settlement.

*In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 806 (3d

Cir. 1995).

Pursuant to the proposed revised settlement, defendants would pay a total amount of up

to $47.6 million to the class members and up to $9.5 million in attorney's fees, for a total

potential settlement payout of $57.1 million. We must determine whether the $47.6 million

proposed settlement payout to the class is within a "general range of reasonableness," given the

potential recovery and the risks of litigation.[6]

Our damage analysis focuses primarily on the damages that the class members would

receive if they were successful in prosecuting their RESPA claims at a trial, since the RESPA

claims, while of questionable merit, nevertheless appear to be the most compelling claims

asserted by the class. RESPA provides that "any person or persons who violate the prohibitions

or limitations of this section shall be jointly and severally liable to the person or persons charged

for the settlement service involved in the violation in an amount equal to three times the amount

of any charge paid for such settlement service." 12 U.S.C.A. §2607(d)(2). Class Counsel

estimates that the "realistic best case" scenario for RESPA damages on a per loan basis is

$4,765, representing $3,675 for origination charges and $1,090 for title service fees. Thus, Class

Counsel projects that the best case scenario for RESPA damages for the class of 44,535 members

is $213,700,720. Notably, Class Counsel's damage analysis is calculated based upon "single

damages," and not the treble damages to which the class would be entitled under §2607.

---

[6] We have not been asked to determine the reasonableness of the attorney's fee award and we do not do so here.

14

The Objectors essentially agree with Class Counsel's base calculation of single damages, but argue that application of the treble damage provision in RESPA is mandatory. Therefore, they contend that the RESPA damages are triple the amount asserted by Class Counsel, which equates to $14,295 per loan, or $636,627,825 for the entire class.[7]

There appears to be a split of authority as to whether a district court should compare the adequacy of a settlement amount to the potential single (or actual) damages of a class, or to the trebled damages of the class where treble damages are available. *Compare In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 257-58 (D. Del. 2002) and *County of Suffolk v. Long Island Lighting Co*, 907 F.2d 1295, 1324 (2d Cir. 1990)("the district judge correctly recognized that it is inappropriate to measure the adequacy of a settlement amount by comparing it to a trebled base recovery figure"), *with In re Compact Disc Minimum Advertised Price Litig.*, 216 F.R.D. 197, 210 n.30 (D. Me. 2003) and *In re Auction Houses Antitrust Litig.*, 2001 WL 170792, at *7 (S.D.N.Y. 2001). We believe that the better rule is that a district court should have the reasonable discretion to make the determination as to the proper base of comparison, depending upon all of the facts and circumstances of the particular case before it. In this case, the district court has already determined, with respect to the original proposed settlement, that a comparison of the proposed settlement amount to the single (actual) damages of the class members, as opposed to the treble damages that they would be entitled to under RESPA, is reasonable and appropriate, and we agree with that conclusion.

---

[7] The Objectors' base figure for single damages is slightly higher per loan than that of Class Counsel and results in treble damages per loan of $16,524.20. Thus, per the Objectors' calculation, the class RESPA damages equal $735,905,247. Although we do not believe the difference to be material for purposes of this Advisory Opinion, we will use Class Counsel's figures since the Objectors' calculation was extrapolated from a limited database while Class Counsel's calculation apparently was derived from a larger database of information that was provided by defendants.

15

Under the single damage analysis (and assuming for purpose of this analysis that most of the $33 million of the original settlement fund was allocated to settlement of the RESPA claims), the class members would receive approximately 15.4% of their potential RESPA damages in settlement.[8]  In our opinion, this percentage falls within a reasonable settlement range "when appropriately discounted for the risk of not prevailing." Id. at 806.  Moreover, the Court of Appeals has cautioned that a district court should not demand too large a settlement based upon its own view of the merits of the litigation because a settlement is, after all, a compromise, and we shall not do so here.  Accordingly, we find that these two *Girsh* factors favor the proposed modified settlement.

### III. CONCLUSION

Based upon our analysis of the *Girsh* factors as set forth above, and also based upon the assumptions previously noted, we find that the proposed modified settlement is fair, reasonable and adequate under Fed.R.Civ.P. 23(e).  Although certain of the *Girsh* factors do not favor settlement at this early stage of the litigation, a substantial majority of the *Girsh* factors support the proposed settlement, and we find that it fairly resolves the dispute between the class plaintiffs and defendants.

Dated: July 5, 2007

_____
Donald E. Ziegler

---

[8] We use the $33 million figure rather than the $47.6 million figure because the Settling Parties have represented that the additional benefit of the modified settlement was added to reflect the TILA/HOEPA claims.  Also, we believe it is appropriate under the circumstances of this case to allocate very little, if any, of the settlement fund to the RICO and state law claims.  Finally, in reviewing the fairness of the settlement, it must be remembered that the class members will receive up to an additional $14 million in proceeds for unasserted TILA/HOEPA claims that have already been deemed not viable.