IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:                              )
                                    )   MDL No. 1674
COMMUNITY BANK OF NORTHERN          )   Case No. 03-0425
VIRGINIA AND GUARANTY BANK          )
SECOND MORTGAGE LITIGATION          )


Gary L. Lancaster,
District Judge.                              August 14, 2008

                MEMORANDUM, ORDER & FINAL JUDGMENT

            This is a class action alleging violations of the Real

Estate Settlement Procedures Act, 12 U.S.C. § 2601, et seq.,

("RESPA"), and the Racketeering Influenced Corrupt Organizations

Act, 18 U.S.C. §§ 1962(c), (d), ("RICO") and asserting related

state law claims. By Memorandum and Order dated January 25, 2008,

[Doc. No. 285], this court preliminarily approved the proposed

settlement and conditionally certified the class. The parties now

seek final certification of the class and approval of the proposed

settlement. For the reasons stated below, the court grants both

requests.

            I.   BACKGROUND

            A. Factual Background

            This case arises from six (6) class action complaints

alleging "an illegal home equity lending scheme against two banks

and a company that acquired second mortgage loans from those banks

in the secondary market." In re Cmty. Bank of N. Va., 418 F.3d

277, 283 (3d Cir. 2005). Plaintiffs[1] filed a Consolidated Amended Class Action Complaint, encompassing all causes of action against all Defendants, on November 10, 2003. [Doc. No. 68].

In the amended complaint, Plaintiffs allege that Community Bank of Northern Virginia[2] ("CBNV") and Guaranty National Bank of Tennessee[3] ("GNBT") issued second mortgage loans to Plaintiffs and the class that included allegedly excessive closing and/or settlement fees. Plaintiffs further allege that Residential Funding Corporation ("RFC") purchased these loans and is, therefore, liable as an assignee of CBNV and GNBT.

Plaintiffs specifically allege that the Shumway Organization ("Shumway") formed associations with CBNV, a state chartered bank, and GNBT, a nationally chartered bank, to provide high-interest second mortgages without being subject to state fee and interest limitations. Plaintiffs contend that "CBNV and GNBT were allegedly paid for nothing more than permitting Shumway to disguise the origins of their loans, thus creating the appearance that fees and interest were paid solely to a depository

---

[1]    The Named Plaintiffs are Brian and Carla Kessler, Ruth J. Davis, John and Rebecca Picard, Nora Miller, William and Ellen Sabo, Robert and Rebecca Clark, Edward Kruska, Russell and Kathleen Ulrich, Thomas Mathis, Stephen and Amy Haney, and Patrice Porco.

[2]    PNC Bank, N.A. is now successor to CBNV.

[3]    On March 12, 2004, the Federal Deposit Insurance Corporation, ("FDIC") was appointed receiver of GNBT.

2

institution." In re Cmty. Bank, 418 F.3d at 284. Rather, Plaintiffs allege that the fees were being paid to Shumway. Plaintiffs further allege that CBNV and GNBT "uniformly misrepresented the apportionment and distribution of settlement and title fees in their HUD-1 Settlement statement forms" at Sections 800 and 1100. Id.

The Consolidated Amended Class Action Complaint asserts nine causes of action including claims for violations of RESPA with respect to the origination fees (Count I), violations of RESPA with respect to the title charges (Count II), violations of RICO (Count III), breach of contract with respect to the origination and title fees (Counts IV and V), contract void or voidable (Count VI), conversion (Count VII), unjust enrichment (Count VIII), money had and received (Count IX), fraud (Count X), violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (Count XI), and civil conspiracy (Count XII).

B. Procedural Background

The parties are well aware of the extensive procedural background of this case and it is set forth in detail in the court's memoranda of October 6, 2006, [Doc. No. 233], and January 25, 2008, [Doc. No. 285], which are incorporated by reference as if fully set forth herein. Suffice to say that the court's December 3, 2003 order, which certified the settlement class and gave final approval to the original settlement, [Doc. No. 107], was later

3

vacated by the Court of Appeals for the Third Circuit for the reasons set forth in In re Cmty. Bank, 418 F.3d 277 (3d Cir. 2005).

## II. CERTIFICATION OF THE CLASS

The Class Plaintiffs and Defendants (hereinafter "Settling Parties") seek certification of the following class:

All persons:

(i) who entered into a loan agreement with CBNV and/or GNBT;

(ii) whose loan was secured by a second mortgage deed or trust on property located in the United States;

(iii) whose loan was purchased by RFC; and

(iv) who were not members of the class certified in the action captioned Baxter v. Guaranty National Bank, et al., Case No. 01-CVS-009168, in the General Court of Justice, Superior Court Division of Wake County, North Carolina.

As defined, the class has over 44,000 members.

Before the court may certify a class for any purpose, however, the proposed class must satisfy all four subsections of Fed.R.Civ.P. 23(a) and at least one provision of Fed.R.Civ.P. 23(b). Here, the Settling Parties seek certification under Fed.R.Civ.P. 23(b)(3). We consider each requirement in turn below.

### A. Rule 23(a)(1): Numerosity

This factor is not in dispute. In order to meet the requirements of Fed.R.Civ.P. 23(a)(1) the class must be "so numerous that joinder of all class members is impracticable."

4

Fed.R.Civ.P. 23(a)(1). The Court of Appeals for the Third Circuit has typically approved classes with forty (40) or more members. Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001). At the fairness hearing, the Settling Parties advised the court that 44,535 notices were sent to class members. Thus, the court finds that the class is sufficiently numerous.

## B. Rule 23(a)(2): Commonality

This factor is not in dispute. The commonality requirement of Fed.R.Civ.P. 23 (a)(2) requires the representative party to establish that there is at least one question of law or fact common to the class. Fed.R.Civ.P. 23 (a)(2); Johnston v. HBO Film Mgmnt., Inc., 265 F.3d 178, 184 (3d Cir. 2001). If a group of plaintiffs allege harm under the same legal theory, the existence of individual facts and circumstances will not be fatal to the commonality inquiry. Baby Neal v. Casey, 43 F.3d 48, 56-58 (3d Cir. 1994). Here, Plaintiffs have alleged that Defendants' conduct violated RESPA, RICO, and related state laws. No one has disputed that there are common questions of law and fact presented by this case. Accordingly, the court finds that the class satisfies Fed.R.Civ.P. 23(a)(2).

## C. Rule 23(a)(3): Typicality

This factor is not in dispute. "Typicality," as set forth in Fed.R.Civ.P. 23(a)(3), requires the court to analyze "whether the named plaintiffs' claims are typical, in common-sense

5

terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class." Beck v. Maximus, Inc., 457 F.3d 291, 295-96 (3d Cir. 2006). In its 2005 opinion vacating this court's prior order, the court of appeals determined that typicality was well established on the record presented in 2003 and no party has disputed that finding. In re Cmty. Bank, 418 F.3d at 303.

## D. Rule 23(a)(4): Adequacy

The Rule 23(a)(4) requirement of adequacy of representation actually encompasses two distinct inquiries designed to protect the interests of absent class members. In re Cmty. Bank, 418 F.3d at 303. Specifically, "it considers whether the named plaintiffs' interests are sufficiently aligned with the absentees', and it tests the qualifications of the counsel to represent the class." Id. (citation omitted).

### (1) Adequacy of Class Counsel

No one has suggested that Class Counsel lack the experience, expertise, or resources to prosecute this consumer class action. Indeed, such a suggestion would be futile. Class Counsel are well known to the court as experienced and professional advocates who have successfully prosecuted multiple class action cases in this court and other courts. See e.g., Palamara v. Kings Family Restaurants, Civil Action No. 07-317 (W.D. Pa. 2008); Byers v. The PNC Financial Services Group, Civil Action No. 07-123 (W.D.

6

Pa. 2008); <u>Gualano v. Abercrombie & Fitch Stores, Inc.</u>, Civil Action No. 03-365 (W.D. Pa. 2004). Rather, the Objectors[4] contend that Class Counsel are inadequate because Class Counsel decided not to assert, in the Consolidated Class Action Complaint, what the court has now concluded are time-barred claims under the Truth In Lending Act, ("TILA") as amended by the Home Ownership and Equity Protection Act ("HOEPA"), 15 U.S.C. § 1601 <u>et seq.</u>

In support of their contention, the court of appeals noted that "[w]ithout adequate exploration of the absent class members' potential [TILA/HOEPA] claims, it is questionable whether Class Counsel could have negotiated in their interest." <u>In re Cmty. Bank</u>, 418 F.3d at 307. However, the parties and the court have now engaged in an extensive exploration of the absent class members' TILA/HOEPA claims. This court concluded that the claims were time-barred. Thus, Class Counsel's strategic decision to pursue other legal theories in this case in no way renders them inadequate. In any event, as seen later, the proposed settlement accounts for the risk that some members of the class could have established sustainable TILA/HOEPA claims and provides for an award where appropriate.

---

[4]  The "Objectors" are those individuals represented by the following law firms: Walters Bender Stroebhen & Vaughn; The Law Offices of Franklin R. Nix; The Sharborough Law Firm, and the Legg Law Firm. The North Carolina residents who are represented by attorney Jerome Hartzell will be referred to as the "North Carolina Objectors."

### (2) Adequacy of Representative Plaintiffs

In its 2005 opinion, the court of appeals found that, although virtually all of the Rule 23(a) and (b) factors were established, the record was incomplete as to the Rule 23(a)(4) requirement of adequacy of representation. Again, the court of appeals exclusively focused on Plaintiffs' failure to assert TILA/HOEPA claims. The court of appeals concluded that "[i]f the [District] Court determines that the TILA and HOEPA claims are viable, there may be serious questions whether the named plaintiffs' interests are sufficiently aligned with those of absent class members as required by Rule 23(a)." In re Cmty. Bank, 418 F.3d at 306. The court of appeals instructed this court "...to examine carefully this matter on remand", but emphasized that "we do not preclude the possibility that the adequacy of class representation can be established on a more developed record." Id. at 308.

In compliance with the court of appeals's mandate, this court established a schedule to examine the "viability" of the TILA/HOEPA claims. The Settling Parties and the Objectors agreed to this procedure and to the proposed briefing schedule. After extensive briefing, [Doc. Nos. 142, 143, 144, 145, 146, 167, 168, 171, 173, 174, 175, 176, 177, 181, 182, 184, 185, 197, 198, 199, 201, 202, 203, 216, and 219], and oral argument, this court concluded that the absent class members' proposed TILA/HOEPA claims

8

were not "viable" because they were time-barred by the applicable statutes of limitation/repose and that none of the expired claims could be resuscitated by the principle of equitable tolling or any other procedural mechanism. [Doc. No. 233]. Thus, there are no absent class members with "viable" TILA/HOEPA claims for the named representatives to protect. As this was the only basis for any challenge to the adequacy of Plaintiffs, we find that they are adequate representatives.

### E. Rule 23(b)(3): Predominance

This factor is not in dispute. The court of appeals stated that "[t]he predominance inquiry tests whether the proposed class is sufficiently cohesive to warrant adjudication by representation." In re Cmty. Bank, 418 F.3d at 308-09. The court of appeals concluded in its 2005 opinion that "[j]ust as the record below supports a finding of typicality, it also supports a finding of predominance." Id. at 309. Accordingly, the predominance requirement has been met.

### F. Rule 23(b)(3): Superiority

This factor is not in dispute. The court of appeals observed that "[t]he superiority requirement asks a court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." Id. (citation and internal quotation omitted). The court of appeals has stated in this case that "[w]e find no

9

reason...why a Rule 23(b)(3) class action is not the superior means to adjudicate this matter." Id. Thus, the Rule 23(b)(3) superiority requirement has been satisfied.

In summary, the court finds that all of the requirements of Federal Rule of Civil Procedure 23(a) and (b) have been met and that final certification is appropriate.

III.  APPROVAL OF THE SETTLEMENT

A. Settlement Terms

The settlement provides for specific payments to class members based on the date of their loan, and the location of the property securing it. A borrower who obtained a second mortgage loan, either from CBNV on or after May 1, 2000, or from GNBT on or after September 19, 2001, is eligible to receive a single payment in the amount of $600.00. A borrower who obtained a second mortgage loan, either from CBNV prior to May 1, 2000, or from GNBT prior to September 19, 2001, is eligible to receive a single payment in the amount of $250.00. A borrower who obtained a loan from either CBNV or GNBT secured by a second mortgage on property located in one of twenty-one (21) listed states is eligible to receive an additional payment of $325.00.

The settlement also provides that "[w]ithout conceding ... the viability of any purported claims the Modification provides an opportunity for Class Members to obtain significant additional benefits, which Class Counsel negotiated based upon the assumption

... that some borrower(s) might be able to overcome a motion to dismiss the TILA/HOEPA claims under Federal Rule of Civil Procedure 12(b)(6)." Doc. No. 225 at ¶ 5. Therefore, in addition, certain class members could be eligible to receive another payment of $332.00 upon submission of a properly completed claim form. The Settling Parties negotiated the content of the claim form. It was designed to provide some indicia that an individual class member would be able to avoid the TILA/HOEPA one-year statute of limitations for damages by pleading facts sufficient to establish fraudulent concealment. This supplementary payment could provide an additional $14,600,000.00 aggregate payment to the class, for a total potential payment of up to $47,600,000.00.

The Settling Parties also agreed that Defendants would create a separate fund of $7,500,000.00 for attorneys' fees and costs. Thereafter, Class Counsel would petition the court for an award of fees not to exceed $7,500,000.00. Defendants further agreed that, upon order of court, they would pay an additional $2,000,000.00 in attorneys' fees. Thus, the total payout to the class, and counsel involved in this case, could reach $57,100,00.00.

B.  Legal Principles

Settlement of class action claims requires court approval. Fed.R.Civ.P. 23(e). Rule 23(e) provides, that "[t]he claims, issues, or defenses of a certified class may be settled,

11

voluntarily dismissed, or compromised only with the court's approval." Id. Final approval of a settlement pursuant to Rule 23(e), turns on whether settlement is "fair, reasonable and adequate." Fed.R.Civ.P. 23(e)(2); In re Cendant Corp. Litig., 264 F.3d 201, 231 (3d Cir. 2001). This inquiry requires the court's independent and objective analysis of "the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims will be extinguished." In re General Motors Corp. Pick-up Truck Fuel Tank Prod. Liab. Litig., 55 F.3d 768, 785 (3d Cir. 1995)("GM Trucks"). It is within the court's sound discretion whether or not to approve a settlement. GM Trucks 55 F.3d at 782-83.

The court of appeals has held that the following nine (9) factors are relevant in determining whether a proposed settlement is fair, reasonable, and adequate: (1) the complexity and duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action; (7) the ability of the defendant to withstand a greater judgment; (8) the range of reasonableness of the settlement in light of the best recovery; and (9) the range of reasonableness of the settlement in light of all the attendant risks of the litigation. Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975).

12

The court of appeals has noted that "the Girsh factors do not provide an exhaustive list of factors to be considered when reviewing a proposed settlement." In re AT & T Corp., 455 F.3d 160, 165 (3d Cir. 2006). Other relevant factors are:

the maturity of the underlying substantive issues, as measured by the experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class and subclass members and the results achieved - or likely to be achieved - for other claimants; whether the class members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

Id.

In addition, the Manual for Complex Litigation, Fourth, ("MCL") published by the Federal Judicial Center[5], lists the relevant factors as follows:

(1) the advantages of the proposed settlement versus the probable outcome of a trial on the merits of liability and damages as to the claims, issues, or defenses of the class and individual class members;

(2) the probable time, duration, and cost of trial;

(3) the probability that the class claims, issues, or defenses could be maintained through trial on a class

---

[5] Although not binding, the court of appeals has long relied on the Manual for Complex Litigation as a useful guide in managing class actions. See, e.g., GM Trucks, 55 F.3d at 778.

13

basis;

(4)     the maturity of the underlying substantive issues, as
        measured by the information and experience gained
        through    adjudicating    individual    actions,    the
        development of scientific knowledge, and other factors
        that bear on the probable outcome of a trial on the
        merits;

(5)     the    extent    of    participation    in    the    settlement
        negotiations by class members or class representatives,
        and by a judge, a magistrate judge, or a special
        master;

(6)     the number and force of objections by class members;

(7)     the probable resources and ability of the parties to
        pay, collect, or enforce the settlement compared with
        enforcement of the probable judgment predicted under
        above paragraph 1 or 4;

(8)     the effect of the settlement on other pending claims;

(9)     similar claims by other classes and subclasses and
        their probable outcome;

(10)    the comparison of results achieved for individual class
        members or subclass members by the settlement or
        compromise and the results achieved or likely to be
        achieved for other claimants pressing similar claims;

(11)    whether class or subclass members have the right to
        request exclusion from the settlement, and, if so, the
        number exercising that right;

(12)    the reasonableness of any provisions for attorneys'
        fees, including agreements on the division of fees
        among attorneys and the terms of any agreements
        affecting the fees to be charged for representing
        individual claimants or objectors;

(13)    the fairness and reasonableness of the procedure for
        processing individual claims under the settlement;

(14)    whether another court has rejected a substantially
        similar settlement for a similar class; and

                              14

(15)   the apparent intrinsic fairness of the settlement
       terms.

MCL, 4th at § 21.62.

### C. Application of Legal Principles to Settlement

As set forth below, the Girsh factors, in addition to the other relevant factors, favor approval of the settlement.

#### 1. The Girsh Factors

##### (a) Complexity of the Litigation

The first Girsh factor "captures the probable costs, in both time and money, of continued litigation." In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 535-36 (3d Cir. 2004). This case has been the subject of 77 motions, 13 conferences and hearings, 76 memoranda and orders, and over 432 substantive docket entries. The briefing, including attached exhibits, by all parties, on all the issues in the case, easily exceeds 10,000 pages.⁶ Bear in mind that the bulk of this extensive motions practice occurred in a case that was supposedly settled five years ago. It is logical to assume that continued litigation would be at least as contentious. Accordingly, this factor weighs in favor of approving the settlement.

---

⁶     This case is part of a larger MDL originally totaling
      13 individual and class actions. The total number of
      docket entries of all the MDL litigation, both here and
      in the transferor districts, is approximately 1,257.

### (b) The Reaction of the Class

This factor "attempts to gauge whether members of the class support the settlement." In re Warfarin, 391 F.3d at 536 (citation omitted). The Settlement Administrator, Tilghman & Co., mailed the class notice via presorted first-class U.S. Mail, postage prepaid, to the last known address of class members on 44,535 loans. Of these notices, 3,048 were returned as undeliverable. According to the court's records, borrowers on 55 loans timely filed notices of exclusion from the class.[7] In addition, borrowers on 114 loans objected to the settlement.

Thus, even excluding the 3,048 notices that were returned as undeliverable, reducing the number of participating loans to 41,487, the number of class members who opted out or filed objections is negligible. The small number of class members who chose to opt out or object relative to the size of the class supports approval of the settlement. Bell Atlantic Corp. v. Bolger, 2 F.3d 1304, 1313-14 n.15 (3d Cir. 1993).

### (c) The Stage of the Proceedings

The third Girsh factor requires the court to examine the procedural history of the case in order to "determine whether counsel had an adequate appreciation of the merits of the case before negotiating" the settlement. In re Warfarin, 391 F.3d at

---

7    Borrowers on ten (10) additional loans filed untimely
     requests for exclusion.

16

537. Formal discovery was not conducted in this case. However, it is clear that after over six years of litigation the Settling Parties are now very well acquainted with the strengths and weaknesses of their claims and defenses. Further, the settlement now under consideration was negotiated in the midst of extensive briefing on the TILA/HOEPA viability issues, an issue which the court of appeals held was central to evaluating the appropriateness of this settlement. The idea that the Settling Parties and the court are not acutely informed of the issues in this case is specious. Thus, this factor weighs in favor of settlement.

### (d) The Risks of Establishing Liability and Damages

The fourth and fifth Girsh factors are appropriately analyzed jointly in this case. These factors direct the court to "examine what the potential rewards (or downside) of litigation might have been had class counsel decided to litigate the claims rather than settle them" and to "attempt to measure the expected value of litigating the action rather than settling it at the current time." In re Cendant Corp. Litig., 264 F.3d at 237-38 (citation and internal quotation omitted).

As an initial matter, the court of appeals did not question and, indeed, appeared to assume that the amounts allocated in the original settlement for the RESPA, RICO, and state law claims actually asserted in the Consolidated Amended Class Action Complaint were sufficient. On remand, the court of appeals

17

directed this court only to "pay particular attention to the prevalence of colorable TILA, HOEPA, and other claims that the individual class members may have that were not asserted by class counsel in the consolidated complaint (or presumably in settlement negotiations)." In re Cmty. Bank, 418 F.3d at 310 (emphasis added). As the proposed settlement provides class members with additional relief for such claims, even though this court found them to be time-barred, it appears clear that it is fair, reasonable, and adequate.

In addition, this court finds that Plaintiffs would face, perhaps not insurmountable, but clearly significant, obstacles to establishing Defendants' liability on a class-wide basis pursuant to RESPA, RICO, and state law. As to RESPA, Plaintiffs would have to establish that Defendants charged fees for services that were not performed. 12 U.S.C. § 2607(b). In addition, Defendants may have valid defenses based upon the one year and/or three year RESPA limitations provision. 12 U.S.C. § 2614. Without determining the merits of these defenses, the court notes that these are precisely the types of individualized factual and legal inquiries that can make successful litigation of a class action case difficult.

To ultimately prevail with respect to RICO, Plaintiffs would have to prove that Defendants, *inter alia*: (i) participated in the "operation or management of a RICO enterprise;" and (ii)

18

this participation was through a "pattern of racketeering activity." 18 U.S.C. § 1962(c). Specifically, RFC maintains that it would vigorously dispute its RICO liability. RFC specifically disputes that it, as the purchaser of closed mortgage loans, could ever be liable under RICO for the alleged activities of CBNV and/or GNBT. We also note that the Court of Appeals for the Second Circuit recently reversed a district court's order and decertified a nationwide class of smokers of "light" cigarettes. There, the court of appeals held that civil RICO claims required a showing of individualized reliance, and were not amenable to class-wide treatment. McLaughlin v. American Tobacco Corp., 522 F.3d 215 (2d Cir. 2008). Although the court need not resolve this issues at this time, it appears that Plaintiffs would face substantial difficulties in establishing Defendants' liability under RICO.

As to the state law claims, it is clear that Plaintiffs would face the difficult task of establishing that the GNBT borrowers' claims are not preempted by the National Bank Act, 12 U.S.C. §§ 85-86 and that the CBNV borrowers' claims are not preempted by the Depository Institutions Deregulation and Monetary Control Act, 12 U.S.C. § 1831d. In fact, counsel for the Missouri and Illinois Objectors, who have been the principle Objectors to this class certification and settlement, filed two (2) class actions, based upon the same alleged scheme against the same Defendants, pursuant to state law. Both attempts were dismissed on

19

the basis of federal preemption.  See Avila v. Cmty. Bank of N. Va., 143 S.W. 3d 1 (Mo. App. W.D. August 26, 2003); Phipps v. Guaranty Nat'l Bank of Tallahassee, 2003 WL 22149646 (W.D. Mo. Sept. 17, 2003) aff'd sub nom, Phipps v. F.D.I.C., 417 F.3d 1006 (8th Cir. 2005).

### (e) Risks of Maintaining the Class Action Through Trial

The court of appeals has noted this factor should be accorded less weight "because the district court always possesses the authority to decertify or modify a class that proves unmanageable...[t]here will always be a 'risk' or possibility of decertification, and consequently the court can always claim this factor weighs in favor of settlement." In re Prudential Ins. Co. Am. Sales Practices Litig. Agent, 148 F.3d 283, 321 (3d Cir. 1998). Although this case would likely be difficult to manage through trial, this factor will be accorded no weight.

### (f) Ability of Defendant to Withstand Greater Judgment

This factor asks "whether the defendant could withstand a judgment for an amount significantly greater than the Settlement." In re Cendant Corp. Litig., 264 F.3d at 240. The Settling Parties have provided evidence of the financial condition of RFC and its parent corporation, GMAC. See Doc. No. 418 at Ex. Nos. 7, 8, and 9. RFC correctly notes that GNBT went into receivership after the first settlement. RFC also submits that it

has suffered financial losses as a result of recent market conditions. It appears clear, however, that RFC could withstand a greater judgment than the maximum settlement amount.

As the court of appeals has pointed out, "the fact that [defendant] could afford to pay more does not mean that it is obligated to pay any more than what the ... class members are entitled to under the theories of liability that existed at the time the settlement was reached." In re Wafarin, 391 F.3d at 538. This factor is, therefore, neutral at best.

### (g) Range of Reasonableness of the Settlement in Light of Best Possible Recovery and all the Attendant Risks of Litigation

The final two Girsh factors require the court to analyze the settlement in light of the best possible recovery and the attendant risks of litigation. Simply put, these factors "evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case." Id. The court of appeals noted that "[t]he factors test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." Id. In assessing the reasonableness of a settlement, the court must compare "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing," with the amount of the proposed settlement. Id. (citation and internal

quotation omitted).

Class Counsel detailed their methodology for estimating the actual damages that could conceivably be recovered, in a best case scenario, after a successful trial. Under that methodology, Class Counsel estimated actual RESPA damages on a per loan basis to be $4,765 ($3,675 for origination charges and $1,090 for fees for title services), which, class-wide, equated to a total estimated actual damages award of $213,700,720. Doc. No. 418 at pp. 39-40.

We have carefully reviewed counsel's methodology in calculating actual damages and find it to be reasonably and professionally done. This settlement, in light of the risks of establishing liability and damages as set forth previously, is a very reasonable compromise. Moreover, given that counsel fees and litigation costs would increase substantially if Plaintiffs were to proceed to a successful jury verdict, this is actually a quite reasonable outcome for the borrowers. As has been pointed out in a similar matter, "the test is whether the settlement is adequate and reasonable, and not whether a better settlement is conceivable." In re Flat Glass Antitrust Litigation, Civ. No. 99-mc-550 (W.D. Pa. 2000).

We are satisfied that the Settling Parties reached this agreement based upon their professional analyses of the law applicable to the claims alleged in the Consolidated Amended Class Action Complaint, and the burdens and expense of litigation,

22

including the risks and uncertainties associated with protracted trials and appeals. The court finds that this settlement is in the best interest of the class.

## 2. Other Relevant Factors

### (a) Third Party Involvement in Settlement Negotiations

The court of appeals has noted that the Girsh factors are neither exhaustive, nor exclusive. There are a number of additional factors that are of particular relevance to this matter. Specifically, the Manual for Complex Litigation provides that the use of a third party mediator to negotiate a settlement is a factor in support of approval. MCL 4th at § 21.62.

The Settling Parties retained the Honorable Timothy K. Lewis, United States Court of Appeals for the Third Circuit (ret.) to serve as a mediator.[8] The Objectors were aware of, but did not participate in, this mediation. In July of 2006, Judge Lewis conducted multiple mediation sessions, both in person and over the telephone. On July 17, 2006, with the aid of Judge Lewis, the parties reached a tentative agreement on a new settlement.

According to the sworn testimony of Judge Lewis, the negotiations between the parties were extensive and vigorous. See

---

[8]     The parties initially retained the Honorable Nicholas
        Politan, United States District Court for the District
        of New Jersey (ret.). On March 3 and 4, 2006, Judge
        Politan conducted a two (2) day mediation session.
        This mediation session was not successful.

Declaration of Hon. Timothy K. Lewis at ¶ 14 [Doc. No. 244, Ex. No. 22]. Further, Judge Lewis testified that the negotiations were conducted at arms-length and "nearly collapsed at various points as the July 18, 2006 hearing on the 'viability' issues approached." Id. After the Settling Parties agreed on the terms of the settlement, on July 24 and 25, 2006, Judge Lewis "presided over a separate mediation in Pittsburgh between Counsel for the Settling Parties, regarding attorneys' fees." Id. at ¶ 15.

Judge Lewis affirmed that "[t]he various negotiations and discussions between and among Counsel for the Settling Parties were conducted at arms-length and reflected vigorous debate concerning highly contested issues...Counsel for the Settling Parties are all very experienced attorneys with extensive class action litigation experience and are of the highest ethical standards...[t]hey represented their clients professionally and ably throughout the sessions I mediated."[9] Id. at ¶ 17.

This court took no role in the parties' retention of Judge Lewis as a mediator to facilitate the settlement. Indeed, the court was not aware of his involvement until after the fact. However, Judge Lewis is well known to the court, having served on

---

[9]    Indeed, based on Judge Lewis's testimony, the settlement is entitled to the initial presumption of fairness which attaches to class action settlements negotiated at arms-length, by experienced practitioners, after sufficient discovery, to which only a small number of class members object. GM Trucks, 55 F.3d at 785.

this court as well as the court of appeals, with distinction. His integrity is beyond reproach and no credible attack has been, or could be, lodged against his assurances.

### (b) Use of an Adjunct

In accordance with the suggested procedure in the Manual for Complex Litigation, on January 31, 2007, this court appointed the Honorable Donald E. Ziegler, United States District Court for the Western District of Pennsylvania (ret.), as an adjunct, or "Friend of the Court."[10] [Doc. No. 245].

This court directed Judge Ziegler to limit his inquiry to "whether the settlement proposed in this matter is fair and reasonable under Fed.R.Civ.P. 23(e)." [Doc. No. 245]. All parties, including the Objectors, appeared before and participated in the proceedings before Judge Ziegler. Judge Ziegler heard oral argument on March 28, 2007. Thereafter, all parties submitted extensive briefs for Judge Ziegler's review. [Doc. Nos. 259, 262, 263, 264, 265, 267, and 272]. On July 5, 2007, Judge Ziegler issued an Advisory Opinion. [Doc. No. 275]. Judge Ziegler

---

[10] The Manual for Complex Litigation states that: "[w]hether the case has been certified as a class at an earlier stage or presented for certification and settlement approval at the same time, the judge can have a court-appointed expert or special master review the proposed settlement terms, gather information necessary to understand how those terms affect the absent class members, and assist the judge in determining whether the fairness, reasonableness, and adequacy requirements for approval are met." MCL 4th at § 21.632.

concluded that the proposed settlement was fair, reasonable, and adequate under Fed.R.Civ.P. 23(e).

Judge Ziegler is well known to this court as a more than able jurist who served this court with distinction for 25 years, including as its Chief Judge. He presided over thousands of civil disputes, including complex multidistrict class action litigation. Since retiring from the court, he has established himself as a highly regarded and much sought after alternative dispute resolution mediator. Clearly, Judge Ziegler has the qualifications and expertise to review the appropriateness of the settlement in aid of the court in this matter. To be clear, we have not simply deferred to Judge Ziegler's judgement. Rather, this court has independently reviewed all of the facts and circumstances of the case, which has been pending before the court for approximately 6 years. We have, however, properly taken Judge Ziegler's well reasoned and thoughtful Advisory Opinion into account in reaching this decision.

## IV. OBJECTIONS

As stated, class members who were borrowers on only 114 loans filed objections[11]. Each was represented by one of the law

---

[11]   Objections were filed on behalf of ten (10) individuals who are not class members. Defendants have filed a motion to strike or dismiss these objections. By their silence, the Objectors appear to concede that these objections should be stricken. Therefore, the motion, [Doc. No. 419], is GRANTED.

firms that we have collectively referred to as representing the Objectors. The Objectors raise a number of arguments as to why class certification and the settlement should not be approved, including: that the settlement amount is inadequate because it fails to value the TILA/HOEPA claims that were not asserted in the Consolidated Amended Class Action Complaint; that the class representatives are inadequate because they did not assert either the TILA/HOEPA claims or the particularly valuable state law claims; that Class Counsel are inadequate for failing to assert those same claims; that Class Counsel are inadequate for negotiating an inadequate settlement; that this is a "claims made" settlement with any unclaimed funds reverting to Defendants; that the court erroneously appointed Judge Ziegler as an adjunct; that the notice failed to comply with the requirements of Rule 23(e); and that the settlement did not create a subclass of North Carolina borrowers. We will address some of their objections below.

A.    TILA/HOEPA

The Objectors essentially restate the arguments they presented during the viability phase of this case in support of their contention that the Class Plaintiffs and Class Counsel are inadequate.

As we have previously noted, we concluded that there are no viable TILA/HOEPA claims. [Doc. No. 288]. Undaunted, much of the Objectors' attention regarding the adequacy of the

27

settlement is focused on the amount of money that they claim could be awarded if rescission of the loans were awarded on a class-wide basis. However, no class member filed an action in any court seeking rescission on a class-wide basis within the statutory period. The Objectors do not dispute that fact but, rather, argue that a class member's letter to his lender purporting to seek rescission of his personal loan within the statutory period (apparently approximately 20 borrowers sent such letters) somehow allows him to state an otherwise untimely class-wide request for rescission of all class members' loans, regardless of the identity of the issuing bank. The Objectors have provided no support for this novel approach and the court has found none.

Moreover, it is extremely unlikely that rescission is even available on a class-wide basis. Virtually every federal court to consider the issue has held that rescission is not amenable to class action treatment. See, e.g., McKenna v. First Horizon Loan Corp., 475 F.3d 418, 421 (1st Cir. 2007), James v. Home Constr. Co. of Mobile, Inc., 621 F.2d 727, 731 (5th Cir. 1980).

In any event, even though we found to the contrary, the settlement does provide the class members with relief for TILA/HOEPA claims for actual damages if the class member can establish that he could potentially save his otherwise untimely claim via equitable tolling. Accordingly, the court finds that these objections are without merit.

28

Regrettably, the Objectors have also accused Class Counsel of collusion with Defendants in exchange for Defendants' agreement not to oppose Class Counsels' request for attorneys' fees. They have presented no evidence in support of this allegation. Nevertheless, the Settling Parties have presented the sworn testimony of the retained mediator, Timothy K. Lewis, who affirmed that the negotiations were at arms-length, professional, and contentious. [Doc. No. 244, Ex. 22]. Judge Lewis further testified that the fee negotiation took place after the settlement agreement was reached in principle. Id. Accordingly, there is conclusive, credible evidence that this settlement was not in any way collusive; not for the reasons advanced by the Objectors, nor for any other reason.

## B. State Law Claims

The Objectors further argue that the Settling Parties overstate the risks of establishing the state law claims on a class-wide basis and, therefore, the settlement fails to adequately compensate the class for their release of these claims. The settlement does, however, account for variations in state law by providing enhanced benefits to class members in twenty-one (21) listed states. Further, it is worth noting again that the Objectors' primary counsel attempted to bring two (2) class actions based upon the same alleged scheme, pursuant to state law. Both attempts were unsuccessful. See Avila and Phipps, supra.

Accordingly, this objection is also without merit.

C. Notice

The Objectors also object to the form and substance of the Notice. Under Fed.R.Civ.P. 23(e), this court must, in the case of a proposed settlement, "direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed.R.Civ.P. 23(e)(1). Rule 23(c)(2) requires that, in a class action certified pursuant to Rule 23(b)(3), "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort," must be provided. Fed.R.Civ.P. 23(c)(2)(B). The notice must inform the class members of the pendency of the action, their right to opt-out, the effect of their failure to do so, and their right to appear through counsel. Id.

This court ordered the Settling Parties to submit a plan for notice, based upon the template notices promulgated by the Federal Judicial Center, and available at www.fjc.gov. They complied. This court ordered that if any interested party had comments regarding the proposed notice, those comments must be filed by a certain date. [Doc. No. 291]. All Objectors timely filed comments to the notice. [Doc. Nos. 294 and 295]. This court then ordered certain revisions. [Doc. No. 296].

Upon consideration of the revised notice plan and the objections, this court approved the revised notice. [Doc. No.

303]. Thereafter, Defendants provided Tilghman & Co. with two (2) electronic files with the names and addresses of class members to whom loans were made. Declaration of Stephens Tilghman, Doc. No. 423, Ex. 1, at ¶ 4. The list contained addresses for 44,535 loans. Id. Tilghman & Co. used the United States Postal Service's National Change of Address database to attempt to update the last known address of class members. Id. at ¶ 5. Additionally, Tilghman & Co. utilized the Postal Service's "address element correction," "delivery point validation," and "delivery sequence files" tools. Id. If a class member's address was not obtained through the Postal Service, Tilghman & Co. submitted the class member's name to the Trans Union database. Id. at ¶ 6.

Tilghman & Co. supervised the mailing of the class notice via presorted first-class U.S. Mail postage prepaid. Id. at ¶ 7. The notice was also published in the national edition of USA Today on two separate occasions. Id. at ¶ 13. Of the 44,535 class notices mailed, 3,048 were returned to Tilghman & Co. as undeliverable. Tilghman & Co. also "arranged for the creation of a (sic) Internet website with the URL www.cbnv-gnbtsettlement.com." Id. at ¶ 14.

The notice approved by the court advised class members of, among other things: the nature of the action (Notice of Certified Class Action Settlement, Doc. No. 297, Ex. 2 at ¶3); the definition of the class certified (Id. at ¶6); the class claims,

31

issues, and defenses (Id. at ¶4); their right to enter an appearance through an attorney (Id. at ¶15); their right to request exclusion from the class (Id. at ¶12); the time and manner for requesting exclusion (Id. at ¶12); the binding effect of a class judgment on members (Id. at ¶13); how and when to file objections to the settlement (Id. at ¶17); how much the lawyers would be paid (Id. at ¶16); how much the named representatives would be paid (Id. at ¶16); and how to obtain additional information (Id. at ¶22).[12]

Any objection that the notice does not comply with the requirements of Fed.R.Civ.P. 23 is without merit.

### D. North Carolina Sub-Class

The final objection that we will specifically address is the North Carolina objectors' argument that class certification should be denied and that the settlement should not be approved because it does not create a sub-class for the North Carolina class members to assert North Carolina state law claims and who they purportedly represent in the companion MDL case. Travis Bumpers and Troy Elliott v. Community Bank of Northern Virginia, et. al, Civ. No. 03-1380, MDL No. 1674, (W.D. Pa.). The peculiar procedural history of that companion litigation was set forth in detail in our January 24, 2008 memorandum, filed at case number 03-1380. [Doc. No. 59]. There, we granted the two North Carolina

---

[12]     The complete approved publication notice is found at Doc. No. 297, Ex. 3.

plaintiffs' motion to remand their case to the North Carolina state court where it was originally filed. At that time, the North Carolina plaintiffs' argued that remand was required because there was no basis for federal jurisdiction over their purely North Carolina state law claims. We agreed.

Remarkably, one of those plaintiffs[13], now objects to the settlement because we did not create a sub-class of North Carolina borrowers. The sole purpose of the requested sub-class would be to assert the same North Carolina state law claims over which they previously argued -- successfully -- that this court has no subject matter jurisdiction. This objection is without merit.

In summary, the court has thoroughly reviewed the Objectors' objections to class certification and settlement, and on most issues, has now done so numerous times. The objections that were not specifically addressed here have been sufficiently addressed in other sections of this memorandum to the extent necessary. Additional filed objections are either unsupportable on the record, contrary to established law, or otherwise without merit and in no need of further discussion.

---

[13]     Travis Bumpers, a named plaintiff in the North Carolina state court action, timely filed a request for exclusion from the class.

V.  CONCLUSION

The class meets all the requirements of Rule 23 and the settlement, in amount and structure, is fair, reasonable, and adequate.  The appropriate order, and final judgment, follows.

BY THE COURT:

Gary L. Lancaster,
United States District Judge

cc:  All Counsel of Record