**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | | |
|---|---|---|---|
| IN RE: | COMMUNITY BANK OF | ) | MDL No. 1674 |
| | NORTHERN VIRGINIA | ) | Civ. Action Nos. |
| | MORTGAGE LENDING | ) | 02-1201, 03-425, |
| | PRACTICES LITIGATION | ) | 05-688, 05-1386 |
| | | ) | ELECTRONICALLY FILED |

## MEMORANDUM OPINION

This matter is before the Court on Defendants' Motions to Dismiss. Doc. nos. 516 and

520. Plaintiffs have filed a putative class action alleging that Defendants' issuance of second

mortgages violated, *inter alia*, the Real Estate Settlement Practices Act, 12 U.S.C. § 2601, *et seq.*

("RESPA"), the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.*, as amended by the

Home Ownerships Equity Protection Act ("HOEPA"), 15 U.S.C. § 1639 *et seq.* and the

Racketeering Influenced Corrupt Organizations Act, 18 U.S.C. §§ 1961, *et seq.* ("RICO").

Defendant Federal Deposit Insurance Corporation ("FDIC"), as receiver for the

Guarantee National Bank of Tallahassee ("GNBT"), has filed a Motion to Dismiss pursuant to

Fed.R.Civ.P. 12(b)(1), 12(b)(6), 12(b)(7), 12(f), 15, 19(a) and 23(d)(1)(D) and 12 U.S.C.

§§ 1821 and 1825 of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989,

Pub.L. 101-73, 103 Stat. 183 (1989) ("FIRREA").[1] Doc. no. 516.

---

[1] As noted, Defendant FDIC filed its Motion, in part, pursuant to F.R.Civ.P. 12(f), which is a Motion to Strike. Because this Court granted Defendant FDIC's Motion to Dismiss, the Court will not address the Motion to Strike in this Opinion.

Defendant PNC has filed a Fed.R.Civ.P. 12(b)(6) Motion arguing that Plaintiffs have failed to state a claim upon which relief can be granted. Doc. no. 520. Defendant PNC further seeks dismissal of certain named Plaintiffs' claims against it for lack of standing. Both Defendants also argue that other named representatives' claims should be dismissed for failure to join their spouses, who, Defendants claim, are indispensable parties. Defendants jointly further contend that Plaintiffs' claims under RESPA and RICO should be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim.

The Court has reviewed the following: (1) the FDIC's Motion to Dismiss for Lack of Jurisdiction and Motion to Dismiss/Strike Plaintiffs' Class Action Claims and Certain Prayers for Relief Against the FDIC and its Brief in Support (doc. nos. 516, 517); (2) PNC's Motion to Dismiss for Failure to State a Claim and its Brief in Support (doc. nos. 520, 521); (3) Plaintiffs' Briefs in Opposition to each of the Motions (doc. nos. 539, 540, respectively); (4) the Reply Brief filed by the FDIC and PNC as to PNC's Motion to Dismiss (doc. no. 548); (5) the Reply Brief filed by the FDIC as to the FDIC's Motion to Dismiss and Motion to Dismiss/Strike (doc. no. 549); (6) Plaintiffs' Sur-Reply Brief as to PNC's Motion to Dismiss (doc. no. 554); (7) Plaintiffs' Sur-Reply Brief as to the FDIC's Motion to Dismiss and Motion to Dismiss/Strike (doc. no. 561); and (8) a transcript of the September 18, 2012, oral argument related to the above-referenced Motions (doc. no. 591); as well as (9) all supplemental authority filed by the parties related to these Motions (doc. nos. 562, 565, 573, 577-579, 594, 598, 599, 600, 602, and 603).

The Court ordered the parties to attend a status conference on June 12, 2013. On June 5, 2013, the Court notified the parties that any new argument pertaining to the Motions to Dismiss should be made orally during the status conference. Upon hearing no new arguments, the Court ruled on these Motions and entered an Order disposing of them. Doc. no. 605. Set forth below is the Court's reasoning for each ruling in that Order (doc. no. 605), which is incorporated post, as if fully set forth herein.

## I. BACKGROUND

The parties and the Court are conversant in the procedural and factual background of this case. The United States Court of Appeals for the Third Circuit has previously set forth, in detail, the convoluted procedural history of these cases. *See In re Cmty. Bank of N. Va.*, 622 F.3d 275, 279–90 (3d Cir. 2010); *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 283–98 (3d Cir. 2005). After the latest remand, Chief Judge Lancaster, who had been assigned these cases, *In re Cmty. Bank of N. Va. Mortgage Lending Practices Litig.*, 368 F.Supp. 2d 1354, 1355 (J.P.M.L. 2005), issued a Case Management Order (doc. no. 506). Thereafter, Plaintiffs filed a Joint Consolidated Amended Complaint (doc. no. 507), Defendants filed Motions to Dismiss (doc. nos. 516 & 520), and Chief Judge Lancaster heard argument thereon. See doc. no. 591. After Chief Judge Lancaster's untimely death, the Judicial Panel on Multidistrict Litigation re-assigned these cases to this Court. *In re Cmty. Bank of N. Va. Mortgage Lending Practices Litig.*, MDL 1674 (J.P.M.L. May 17, 2013). All references to actions taken by "this Court" prior to May 17, 2013, refer to actions taken by Chief Judge Lancaster.

The following facts are taken from the Joint Consolidated Amended Complaint (doc. no. 507), and are accepted as true solely for the purposes of this Memorandum Opinion. Other facts relevant to this Court's decision are set forth in context as necessary.

In the late 1990s, an organization run by David Shumway, Devan Shumway, and Randy Bapst founded an organization to originate and sell second mortgages to investors. This organization partnered with Defendant PNC (then known as the Community Bank of Northern Virginia ("CBNV"), a regulated depository institution), to originate second mortgages, charge origination fees, and then sell them almost immediately to investors such as the Residential Funding Corporation ("RFC"). The Joint Consolidated Amended Complaint alleges that the issuance of these second mortgages violated RESPA, TILA/HOEPA, and RICO.

A.  CBNV and GNBT

CBNV is a Virginia Corporation with its principal place of business in Virginia and, as a lender, made approximately 22,810 of the loans at issue here.   CBNV is now known as PNC National Bank.  GNBT was a national bank with its principal place of business in Tallahassee, Florida.  GNBT made at least 21,725 of the loans at issue here.  GNBT was closed by the Office of Comptroller of Currency in 2004.  The FDIC was substituted for GNBT in this litigation in 2004.  Facts regarding the FDIC receivership relevant to these Motions are set forth, *infra*, at section C.

B.  Representative Plaintiffs

Named as representative Plaintiffs are:  Ruth J. Davis, Phillp F. and Jeannie C. Kossler, Brian W. and Carl M. Kessler, Patrice Porco, Thomas T. Mathis, Stephen R. and Amy L. Haney,

4

John and Rebecca Picard, William and Ellen Sabo, Russell and Kathleen Ulrich, Nora H. Miller, Robert A. and Rebecca A. Clark, Edward R. Kruszka, Jr., Tina Merl Boor, Martin J. Baratz, Clell L. Hobson, Rosa Kelly Parkinson, John and Kathy Nixon, Brian Cartee, Mack and Robin Dorman, Jerome and Charetta Roberts, Melba Brown, Flora A. Gaskin, Roy Lee and Ruthie Mae Logan, Shawn and Lorene Starkey, John and Rowena Drennen, Richard Montgomery, and Tammy and David Waseem.

      1.     <u>Ruth Davis</u>

Ms. Davis had a CBNV loan, which closed on February 22, 1999. According to the Joint Consolidated Amended Complaint, this was the date she was first given her TILA and HOEPA disclosures. The principal balance of her loan was $24,100.00 to be repaid, with an interest rate of 13.75% (APR of 15.456%), monthly for 24 years. Ms. Davis executed a deed of trust that granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to Ms. Davis. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 802 (a "Loan Discount"), 804 ("Credit Report"), and 807 (a "Flood Certification Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1111 ("Overnight Fee"), and 1112 ("Processing Fee"). Ms. Davis was given a Federal Truth in Lending Disclosure Statement that identified her Finance Charge as $63,971.58 and her APR as 15.46%. Ms. Davis filed for personal bankruptcy on April 15, 2005. She did not schedule this action in her petition.

2.     Phillp F. and Jeannie C. Kossler

The Kosslers had a CBNV loan, which closed on or about July 28, 1998.   According to the Joint Consolidated Amended Complaint, this was the date the Kosslers were first given their TILA and HOEPA disclosures.  The principal balance of their loan was $30,000.00  to be repaid with an interest rate of 12.99% (APR of 14.817%) monthly for 15 years.  The Kosslers executed a deed of trust that granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans.  Several fees were itemized on the HUD-1 settlement statement given to the Kosslers.  Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 804 ("Credit Report"), and 808 ("Document Review").  In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), and 1111 ("Signing Agent").   The Kosslers were given a Federal Truth in Lending Disclosure Statement that identified their Finance Charge as $40,938.40 and their APR as 14.817%.

3.     Brian W. and Carl M. Kessler

The Kesslers had a CBNV loan, which closed on or about April 30, 1999.  According to the Joint Consolidated Amended Complaint, this was the date the Kesslers were first given their TILA and HOEPA disclosures.  The principal balance of their loan was $33,000.00 to be repaid, with an interest rate of 14.75% (APR of 17.841%), monthly for 15 years.  The Kesslers executed a deed of trust that granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans.  Several fees were itemized on the HUD-1 settlement statement given to the Kesslers.  Among those fees were the "Section 800" fees contained in Line Nos. 801 (a

"Loan Origination Fee"), 802 ("Loan Discount"), 807 ("Application Fee"), and 811 ("Underwriting Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1111 ("Overnight Fee"), and 1112 ("Document Review"). The Kosslers were given a Federal Truth in Lending Disclosure Statement that identified their Finance Charge as $53,587.45 and their APR as 17.841%.

4.    Patrice Porco

Patrice Porco had a GNBT loan which closed on or about September 9, 2000. According to the Joint Consolidated Amended Complaint, this was the date she was first given her TILA and HOEPA disclosures. The principal balance of her loan was $29,800.00 to be repaid, with an interest rate of 12.99% (APR of 16.71%), monthly for 15 years. Ms. Porco executed a deed of trust that granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to Ms. Porco. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 802 ("Loan Discount"), 811 ("Underwriting Fee"), and 813 ("Application Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1111 ("Overnight Fee"), 1112 ("Document Review"), and 1113 ("Processing Fee"). Ms. Porco was given a Federal Truth in Lending Disclosure Statement that identified her Finance Charge as $43,024.86 and her APR as 16.7196%.

5.      Thomas T. Mathis

Thomas T. Mathis had a GNBT loan which closed on or about June 7, 2001.  According to the Joint Consolidated Amended Complaint, this was the date he was first given his TILA and HOEPA disclosures.  The principal balance of his loan was $25,000.00 to be repaid, with an interest rate of 14.99% (APR of 17.24%), monthly for 25 years.  Mr. Mathis executed a deed of trust that granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans.  Several fees were itemized on the HUD-1 settlement statement given to Mr. Mathis.  Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 804 ("Credit Report"), 811 ("Underwriting Fee"), and 812 ("Flood Certification Fee").  In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1111 ("Overnight Fee"), 1112 ("Document Review"), and 1113 ("Processing Fee").  Mr. Mathis was given a Federal Truth in Lending Disclosure Statement that identified his Finance Charge as $74,020.58 and their APR as 17.2411%.  Mr. Mathis filed for personal bankruptcy on April 29, 2004.  He did not schedule this action in his petition.

6.      Stephen R. and Amy L. Haney

Stephen R. and Amy L. Haney had a GNBT loan which closed on May 23, 2001.  According to the Joint Consolidated Amended Complaint, this was the date the Haneys were first given their TILA and HOEPA disclosures.  The principal balance of their loan was $24,500.00 to be paid monthly for 15 years.  The Joint Consolidated Amended Complaint does not indicate the interest rate or APR.  The Haneys executed a deed of trust that granted GNBT a security lien in

residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to the Haneys. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 802 ("Loan Discount"), 804 ("Credit Report"), 811 ("Underwriting Fee"), and 812 ("Flood Certification Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1111 ("Overnight Fee"), 1112 ("Document Review"), and 1113 ("Processing Fee"). The Haneys were given a Federal Truth in Lending Disclosure Statement that identified their Finance Charge as $31,996.99 and their APR as 15.0957%. The Haneys filed for personal bankruptcy on June 2, 2009. They did not schedule this action in their petition.

### 7. John and Rebecca Picard

John and Rebecca Picard had a CBNV loan which closed on November 30, 1999. According to the Joint Consolidated Amended Complaint, this was the date the Picards were first given their TILA and HOEPA disclosures. The principal balance of the loan was $47,900.00 to be repaid monthly for 15 years. The interest rate was 14.99% (APR of 18.416%). The Picards executed a deed of trust that granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to the Picards. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 802 ("Loan Discount"), 803 ("Appraisal Fee"), 807 ("Application Fee"), and 811 ("Underwriting Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"),

9

1103 ("Title Examination"), 1111 ("Overnight Fee"), 1112 ("Document Review"), and 1113 ("Processing Fee"). The Picards were given a Federal Truth in Lending Disclosure Statement that identified their Finance Charge as $79,767.89 and their APR as 18.416%.

8.     <u>William and Ellen Sabo</u>

William and Ellen Sabo had a CBNV loan which closed on or about October 15, 1999. According to the Joint Consolidated Amended Complaint, this was the date the Sabos were first given their TILA and HOEPA disclosures. The principal balance of their loan was $35,000.00 to be paid over 15 years. The interest rate was 14.75% (APR of 17.390%). The Sabos executed a deed of trust that granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to the Sabos. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 808 ("Application Fee"), and 809 ("Underwriting Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1111 ("Overnight Fee"), and 1112 ("Document Review"). The Sabos were given a Federal Truth in Lending Disclosure Statement that identified their Finance Charge as $56,211.00 and their APR as 17.39%. Ms. Sabo filed for personal bankruptcy on December 13, 2007. She did not schedule this action in her petition.

9.     <u>Russell and Kathleen Ulrich</u>

Russell and Kathleen Ulrich had a GNBT loan which closed on or about August 8, 2000. According to the Joint Consolidated Amended Complaint, this was the date the Ulriches were

first given their TILA and HOEPA disclosures. The principal balance of their loan was $46,850.00 to be paid over 25 years. The interest rate was 12.99% (APR of 15.469%). The Ulriches executed a deed of trust that granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to the Ulriches. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 802 ("Loan Discount"), 807 ("Application Fee"), and 811 ("Underwriting Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1111 ("Overnight Fee"), 1112 ("Document Review"), and 1113 ("Processing Fee"). The Ulriches were given a Federal Truth in Lending Disclosure Statement that identified their Finance Charge as $118,324.73 and their APR as 15.49%. Mrs. Ulrich filed for personal bankruptcy on February 26, 2007. She did not schedule this action in her petition.

          10.    <u>Nora H. Miller</u>

Nora H. Miller had a CBNV loan which closed on or about April 30, 1999. According to the JOINT CONSOLIDATED AMENDED COMPLAINT, this was the date she was first given her TILA and HOEPA disclosures. The principal balance of her loan was $34,000.00 to be paid over 15 years. The interest rate was 12.50% (APR of 15.590%). Ms. Miller executed a deed of trust that granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to the Ms. Miller. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan

Origination Fee"), and 802 ("Loan Discount"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1111 ("Overnight Fee"), and 1112 ("Document Review"). Ms. Miller was given a Federal Truth in Lending Disclosure Statement that identified her Finance Charge as $46,332.99 and her APR as 15.59%. Ms. Miller filed for personal bankruptcy on August 15, 2003 and August 20, 2009. She did not schedule this action in either petition.

          11.     <u>Robert A. and Rebecca A. Clark</u>

Robert A. and Rebecca A. Clark had a GNBT loan which closed on or about March 20, 2001. According to the Joint Consolidated Amended Complaint, this was the date the Clarks were first given their TILA and HOEPA disclosures. The principal balance of their loan was $27,500.00 to be paid over 10 years. The interest rate was 11.99% (APR of 16.0042%). The Clarks executed a deed of trust that granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to the Clarks. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 802 ("Loan Discount"), 804 ("Credit Report"), 811 ("Underwriting Fee"), and 812 ("Flood Certification Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1111 ("Overnight Fee"), 1112 ("Document Review"), and 1113 ("Processing Fee"). The Clarks were given a Federal Truth in Lending Disclosure Statement that identified their Finance Charge as $23,785.92 and their APR

as 16.0042%.  The Clarks filed for personal bankruptcy on April 28, 1997 and  July 16, 2009.  They did not schedule this action in either petition.

### 12. Edward R. Kruszka, Jr.

Edward R. Kruszka, Jr. had a GNBT loan which closed on or about May 5, 2001.  According to the Joint Consolidated Amended Complaint, this was the date he was first given his TILA and HOEPA disclosures.  The principal balance of his loan was $20,100.00 to be paid over 20 years.  The interest rate was 16.99% (APR of 19.772%).   Mr. Kruska executed a deed of trust that granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans.  Several fees were itemized on the HUD-1 settlement statement given to Mr. Kruszka.  Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 802 ("Loan Discount"), 804 ("Credit Report"), 807 ("Application Fee"), 810 ("E Appraisal"), and 811 ("Underwriting Fee").  In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1111 ("Overnight Fee"), 1112 ("Document Review"), and 1113 ("Processing Fee").  Mr. Kruszka was given a Federal Truth in Lending Disclosure Statement that identified his Finance Charge as $53,198.40 and his APR as 19.722%.  Mr. Kruszka filed for bankruptcy on May 24, 2002.  He did not schedule this action in his petition.

### 13. Tina Merl Boor

Tina Merl Boor, formerly known as Tina Merl, had a CBNV loan which closed on or about December 9, 2000.  According to the Joint Consolidated Amended Complaint, this was the date she was first given her TILA and HOEPA disclosures.  The principal balance of her loan

was not included in the Joint Consolidated Amended Complaint. Several fees were itemized on the HUD-1 settlement statement given to Ms. Boor. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 802 ("Loan Discount"), 808 ("Lender Document Review Fee"), 810 ("Lender Underwriting Fee"), and 811 ("Document Review"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), and 1105 ("Document Preparation"). The Joint Consolidated Amended Complaint contains no information regarding the Finance Charge, nor does it contain any information regarding the APR. Ms. Boor field for bankruptcy on August 20, 2007. She did not schedule this action in her petition.

### 14. Martin J. Baratz

Martin J. Baratz had a GNBT loan which closed on or about January 16, 2002. According to the Joint Consolidated Amended Complaint, this was the date he was first given his TILA and HOEPA disclosures. The Joint Consolidated Amended Complaint contains no further allegations regarding Mr. Baratz's loan.

### 15. Clell L. Hobson

Clell L. Hobson had a CBNV loan which closed on or about May 2, 2001, via FedEx delivery with return, pre-paid, next-day return envelope. According to the Joint Consolidated Amended Complaint, this was the date he was first given his TILA and HOEPA disclosures. The principal balance of his loan was $55,500.00 to be paid over 20 years. The interest rate was 17.75% (APR of 19.904%). Mr. Hobson executed a deed of trust that granted CBNV a security

lien in residential real estate subject to one or more prior mortgage loans.  Several fees were itemized on the HUD-1 settlement statement given to Mr. Hobson.  Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 802 ("Loan Discount"), 808 ("Lender Document Review"), 809 ("Lender Underwriting Fee"), and 810 ("Lender Application Fee").  In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), and 1105 ("Document Preparation").  Mr. Hobson was given a Federal Truth in Lending Disclosure Statement that identified his Finance Charge as $152,996.30 and his APR as 19.904%.  The Joint Consolidated Amended Complaint further alleges that other aspects of the notices given to Mr. Hobson violated HOEPA.  Mr. Hobson filed for personal bankruptcy on December 2, 2002.  He did not schedule this claim in his petition.

16.    Rosa Kelly Parkinson

Rosa Kelly Parkinson, then known as Rosa Kelly, had a GNBT loan which closed on or about Septmber 27, 2000 via a courier who obtained the execution of the loans in a public library near Decatur, George.  According to the Joint Consolidated Amended Complaint, this was the date she was first given her TILA and HOEPA disclosures.  The principal balance of her loan was $51,000.00 to be paid over 25 years.  The interest rate was 13.99% (APR of 16.532%).  Captain Kelly executed a deed of trust that granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans.  Several fees were itemized on the HUD-1 settlement statement given to Captain Parkinson.  Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 802 ("Loan Discount"), 807

("Application Fee"), and 811 ("Underwriting Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1112 ("Document Review"), and 1113 ("Processing Fee"). Captain Kelly was given a Federal Truth in Lending Disclosure Statement that identified her Finance Charge as $109,105.81 and her APR as 16.532%. The Joint Consolidated Amended Complaint further alleges that other aspects of the notices given to Captain Kelly violated HOEPA and Georgia law.

### 17. John and Kathy Nixon

John and Kathy Nixon had a CBNV loan which closed on or about February 2, 2001, via FedEx to their home in Florida. According to the Joint Consolidated Amended Complaint, this was the date the Nixons were first given their TILA and HOEPA disclosures. The principal balance of their loan was $49,999.00 to be paid over 25 years. The interest rate was 18.25% (APR of 20.261%). The Nixons executed a deed of trust that granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to the Nixons. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee") and 807 ("Application"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), and 1105 ("Document Preparation"). The Nixons were given a Federal Truth in Lending Disclosure Statement that identified their Finance Charge as $185,347.31 and their APR as 20.261%. The

Joint Consolidated Amended Complaint further alleges that other aspects of the notices given to the Nixons violated HOEPA.

18. Brian Cartee

Brian Cartee had a GNBT loan which closed on or about February 25, 2002. According to the Joint Consolidated Amended Complaint, this was the date he was first given his TILA and HOEPA disclosures, via FedEx. The principal balance of his loan was $29,500.00 to be paid over 15 years. The interest rate was 12.750% (APR of 15.556%). Mr. Cartee executed a deed of trust which granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to Mr. Cartee. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 802 ("Loan Discount"), 808 ("GA State Tax Fee"), and 810 ("Lender Application Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), and 1113 ("Processing Fee"). Mr. Cartee was given a Federal Truth in Lending Disclosure Statement that identified his Finance Charge as $40,694.64 and his APR as 15.5596%. The Joint Consolidated Amended Complaint further alleges that other aspects of the notices given to Mr. Cartee violated HOEPA.

19. Mack and Robin Dorman

Mack and Robin Dorman had a GNBT loan which closed on or about February 11, 2002. According to the Joint Consolidated Amended Complaint, this was the date the Dormans were first given their TILA and HOEPA disclosures, which arrived via FedEx delivery. The principal

balance of their loan was $29,600.00 to be paid over 10 years. The Joint Consolidated Amended Complaint does not identify the interest rate but alleges that the APR was 16.4352%. The Dormans executed a deed of trust that granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to the Dormans. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 802 ("Loan Discount"), 808 ("GA State Tax Fee"), and 810 ("Lender Application Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), and 1113 ("Processing Fee"). The Dormans were given a Federal Truth in Lending Disclosure Statement that identified their Finance Charge as $40,694.64 and their APR as 16.4532%. The Joint Consolidated Amended Complaint further alleges that other aspects of the notices given to the Dormans violated HOEPA.

20.    Jerome and Charetta Roberts

Jerome and Charetta Roberts had a GNBT loan which closed on or about October 9, 2000. According to the Joint Consolidated Amended Complaint, this was the date the Roberts were first given their TILA and HOEPA disclosures via courier to Mr. Roberts' place of work. The principal balance of their loan was $39,00.00 to be paid over 25 years. The interest rate was 14.99% (APR of 17.828%). The Roberts executed a deed of trust which granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to the Roberts. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 802 ("Loan

Discount"), 811 ("Underwriting Fee"), and 813 ("Application Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1112 ("Document Review"), and 1113 ("Processing Fee"). The Roberts were given a Federal Truth in Lending Disclosure Statement that identified their Finance Charge as $116,570.41 and their APR as 17.828%. The Joint Consolidated Amended Complaint further alleges that other aspects of the notices given to the Roberts violated HOEPA and Georgia law.

        21.    <u>Flora A. Gaskin</u>

Flora A. Gaskin had a GNBT loan which closed on or about August 8, 2001. According to the Joint Consolidated Amended Complaint, this was the date she was first given her TILA and HOEPA disclosures via a courier who conducted the closing. The principal balance of their loan was $30,000.00 to be paid over 15 years. The interest rate was 15.99% (APR of 17.965%). Ms. Gaskin executed a deed of trust that granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to Ms. Gaskin. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 805 ("Application Fee"), 810 ("Underwriting Fee"), and 811 ("Lender Document Review Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), and 1105 ("Document Preparation Fee"). Ms. Gaskin was given a Federal Truth in Lending Disclosure Statement that identified

her Finance Charge as $49,435.17 and her APR as 17.965%. The Joint Consolidated Amended Complaint further alleges that other aspects of the notices given to Ms. Gaskin violated HOEPA.

22. Melba Brown

Melba Brown had a CBNV loan which closed on or about August 12, 2000. According to the Joint Consolidated Amended Complaint, this was the date she was first given her TILA and HOEPA disclosures via courier. The principal balance of her loan was $30,000.00 to be paid over 15 years. The interest rate was 17.450% (APR of 20.704%). Ms. Brown executed a deed of trust that granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to Ms. Brown. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 802 ("Loan Discount"), 804 ("Credit Report"), 808 ("Lender Underwriting Fee"), and 810 ("Lender Document Review Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), and 1111 ("Disbursement Fee"). Ms. Brown was given a Federal Truth in Lending Disclosure Statement that identified her Finance Charge as $58,774.00 and her APR as 20.704%. The Joint Consolidated Amended Complaint further alleges that other aspects of the notices given to Ms. Brown violated HOEPA. Ms. Brown filed for personal bankruptcy on August 24, 2005. She did not schedule this action in her petition.

23. Mr. and Mrs. Roger Turner

Mr. and Mrs. Roger Turner first mentioned in the Joint Consolidated Amended Complaint at paragraph 339, had a GNBT loan that closed on or about October 10, 2000.

According to the Joint Consolidated Amended Complaint, this was the date the Turners were first given their TILA and HOEPA disclosures via courier. The principal balance of their loan was $16,200.00 to be paid over 25 years. The interest rate was 14.375% (APR of 18.033%). The Turners executed a security deed for the benefit of GNBT. This security deed granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to the Turners. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 807 ("Application Fee"), and 811 ("Underwriting Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1111 ("Overnight Fee"), 1112 ("Document Review Fee"), and 1113 ("Processing Fee"). The Turners were given a Federal Truth in Lending Disclosure Statement that identified their Finance Charge as $46,731.38 and their APR as 18.033%. The Joint Consolidated Amended Complaint further alleges that other aspects of the notices given to the Tuners violated HOEPA.

24.     Roy Lee and Ruthie Mae Logan

Roy Lee and Ruthie Mae Logan had a GNBT loan which closed on or about July 11, 2001. According to the Joint Consolidated Amended Complaint, this was the date the Logans were first given their TILA and HOEPA disclosures via courier who conducted the closing. The principal balance of their loan was $18,600.00 to be paid over 10 years. The interest rate was 11.99% (APR of 15.692%). The Logans executed a security deed in favor of GNBT. The security deed granted GNBT a security lien in residential real estate subject to one or more prior

21

mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to the Logans. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 804 ("Credit Report"), 811 ("Underwriting Fee"), and 812 ("Flood Certification Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1111 ("Overnight Fee"), 1112 ("Document Review"), and 1113 ("Processing Fee"). The Logans were given a Federal Truth in Lending Disclosure Statement that identified their Finance Charge as $15,904.64 and their APR as 15.6972%.[2] The Joint Consolidated Amended Complaint further alleges that other aspects of the notices given to the Logans violated HOEPA.

### 25. Shawn and Lorene Starkey

Shawn and Lorene Starkey had a GNBT loan which closed on or about October 31, 2001. According to the Joint Consolidated Amended Complaint, this was the date the Starkeys were first given their TILA and HOEPA disclosures. The principal balance of their loan was $30,300.00 to be paid over 15 years. The interest rate was 11.99%. The Starkeys executed a deed of trust for the benefit of GNBT. The deed of trust granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to the Starkeys. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 802 ("Loan Discount"), 804

---

[2] The Court notes that the Joint Consolidated Amended Complaint indicates in one place that the APR is 15.692%, and in another place the APR is 15.6972%.

("Credit Report"), 811 ("Underwriting Fee"), and 812 ("Flood Certification Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1111 ("Overnight Fee"), 1112 ("Document Review"), and 1113 ("Processing Fee"). The Starkeys were given a Federal Truth in Lending Disclosure Statement that identified their Finance Charge as $39,391.81 and their APR as 14.9528%. The Starkeys filed for personal bankruptcy on May 13, 2005. They did not schedule this action in their petition.

26.     John and Rowena Drennen

John and Rowena Drennen had a GNBT loan which closed on or about July 28, 2001. According to the Joint Consolidated Amended Complaint, this was the date they were first given their TILA and HOEPA disclosures. The principal balance of their loan was $47,100.00 to be paid over 25 years. The interest rate was 15.99% (APR of 18.6284%). The Drennens executed a deed of trust for the benefit of GNBT. This deed of trust granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to the Drennens. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 802 ("Loan Discount"), 804 ("Credit Report"), 811 ("Underwriting Fee"), 812 ("Flood Certification Fee"), and 813 ("E Appraisal Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1111 ("Overnight Fee"), 1112 ("Document Review"), and 1113 ("Processing Fee"). The Drennens were given a Federal Truth in Lending Disclosure Statement that identified

their Finance Charge as $150,605.00 and their APR as 15.49%. The Drennens filed for personal bankruptcy on October 19, 2004, and Ms. Drennen filed for bankruptcy on August 4, 2005. This action was not scheduled in either petition. According to Plaintiffs, Ms. Drennen has reopened her bankruptcy, and the trustee has abandoned this claim to her.

27.   Richard Montgomery

Richard Montgomery, had a GNBT loan which closed on or about November 16, 2001. According to the Joint Consolidated Amended Complaint, this was the date he was first given his TILA and HOEPA disclosures. The principal balance of his loan was $81,000.00 to be paid over 15 years. The interest rate was 13.2483% (APR of 18.6284%). Mr. Montgomery executed a deed of trust for the benefit of GNBT. This trust granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to Mr. Montgomery. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 802 ("Loan Discount"), 804 ("Credit Report"), 812 ("Flood Certification Fee"), and 813 ("E Appraisal"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1111 ("Overnight Fee"), 1112 ("Document Review"), and 1113 ("Processing Fee"). Mr. Montgomery was given a Federal Truth in Lending Disclosure Statement that identified his Finance Charge as $92,588.65 and his APR was 13.248%.

28.     Tammy and David Wasem

Tammy and David Wasem had a CBNV loan which closed on or about August 9, 2001. According to the Joint Consolidated Amended Complaint, this was the date the Wasems were first given their TILA and HOEPA disclosures. The principal balance of their loan was $47,000.00 to be paid over 15 years. The interest rate was 14.5% (APR of 15.456%). The Wasems executed a deed of trust for the benefit of CBNV. This deed of trust granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to the Wasems. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 805 ("Application Fee"), and 810 ("Underwriting Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1105 ("Document Preparation"), and 1112 ("Document Review"). The Wasems were given a Federal Truth in Lending Disclosure Statement that identified their Finance Charge as $60,683.67 and their APR as 14.527%.

C.  Facts related to FDIC Appointment as Receiver for GNBT

The FDIC was appointed as receiver for GNBT in 2004. The FDIC published notice of its appointment in the newspapers local to the GNBT headquarters in Florida. The FDIC further sent notice to Plaintiffs' counsel. Plaintiffs' counsel filed three claims post receivership. On June 14, 2004, Plaintiffs' counsel filed three (3) proofs of claim. The first proof of claim was filed as a class claim on behalf of a class of unnamed borrowers of GNBT, as defined by the first settlement agreement approved by this Court on December 4, 2003. This claim was disallowed

by the non-action of the FDIC 180 days after it was filed on December 11, 2004. The second proof of claim was filed on behalf of a class of borrowers as defined by Civil Action No. 02-1201. This claim was denied on November 22, 2004. The third proof of claim was filed on behalf of the putative class in *Phipps v. GNBT*, Case No. 03-420 (W.D. Mo., April 3, 2003). This case was dismissed by the United States District Court for the Western District of Missouri on September 17, 2003, several months prior to the claim being filed. *Phipps v. GNBT*, 2003 WL 2214964. This claim was denied by the FDIC on November 2, 2004. The dismissal of the case was upheld by the Court of Appeals for the Eighth Circuit on July 28, 2005. *Phipps v. FDIC,* 417 F.3d 1006 (8th Cir. 2005).

## II. STANDARD OF REVIEW

### A. Rule 12(b)(1)

A party may move for dismissal pursuant to Fed.R.Civ.P. 12(b)(1) based on lack of subject matter jurisdiction. When analyzing a Rule 12(b)(1) challenge, the Court must first determine whether the moving party is making a facial or factual jurisdictional attack. *CNA v. U.S.*, 535 F.3d 132, 139 (3d Cir. 2008). "If [it] is a facial attack, the court looks only at the allegations in the pleadings and does so in the light most favorable to the [non-moving party]." *U.S. ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 513 (3d Cir. 2007). However, if it is a factual jurisdictional attack, where the moving party argues that the Court lacks jurisdiction based on evidence outside of the pleadings, the Court may "consider and weigh evidence outside the pleadings . . . ." *Id*. at 514. A jurisdictional challenge is a factual challenge if "it concerns not an alleged pleading deficiency, but rather the actual failure of [the non-moving party's]

claims to comport with the jurisdictional prerequisites." *Id*. Under these circumstances, the Court is not "confined to the allegations in [the . . .] complaint," and the Court is "entitled to independently evaluate the evidence to resolve disputes over jurisdictional facts." *S.R.P. ex rel Abunabba v. U.S.*, 676 F.3d 329, 332 (3d Cir. 2012).

Here, Defendant FDIC makes a factual challenge to this Court's subject matter jurisdiction as to Plaintiffs' claims against it. Thus, the Court is free to consider and weigh evidence outside the pleadings.

B. Rule 12(b)(6)

Federal Courts require notice pleading, rather than the heightened standard of fact pleading when evaluating a motion brought pursuant to Fed.R.Civ.P. 12(b)(6). Fed.R.Civ.P. 8(a)(2) requires only "'a short and plain statement of the claim showing that the pleader is entitled to relief' in order to 'give defendant fair notice of what the . . . claim is and the grounds on which it rests.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

After the United States Supreme Court decided *Twombly* and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the United States Court of Appeals for the Third Circuit explained that a District Court must engage in analysis of the following three steps to test the sufficiency of a Complaint:

> First, the court must take note of the elements a plaintiff must plea to state a claim. Second the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and the determine whether they plausibly give rise to an entitled for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013) (citation omitted).

The third step of this analysis requires this Court to consider the specific nature of the claims presented and to determine whether the facts pled to substantiate the claims are sufficient to show a "plausible claim for relief." *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013). "While legal conclusions can provide the framework of a Complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 664.

This Court may not dismiss a Complaint merely because it appears unlikely or improbable that Plaintiff can prove the facts alleged or will ultimately prevail on the merits. *Twombly*, 550 U.S. at 563, n. 8. Instead, this Court must ask whether facts alleged raise a reasonable expectation that discovery will reveal evidence of the necessary elements. *Id*. at 556. Generally speaking, a Complaint that provides adequate facts to establish "how, when, and where" will survive a Motion to Dismiss. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 212 (3d Cir. 2009). In short, a Fed.R.Civ.P. 12(b)(6) Motion to Dismiss should not be granted if a party alleges facts which could, if established at trial, entitle that party to relief. *Twombly*, 550 U.S. at 563, n. 8.

In addition, Defendants challenge the standing of some of the named representatives. The doctrine of standing "focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." *In re Majestic Star Casino*, --- F.3d ---, 2013 WL 2162781 (3d Cir. May 21, 2013) (quoting *Valley Forge Christian Coll. v. Ams. United For Separation of Church & State, Inc.*, 454 U.S. 464, 484(1982)) (internal quotation marks omitted). It "involves both constitutional limitations on federal-court jurisdiction and prudential

limitations on its exercise." *Id*. at \*6, (citation and internal quotations omitted). "One of those prudential limits demands that the plaintiff generally . . . assert his own legal rights and interests, and [ ]not rest his claim to relief on the legal rights or interests of third parties." *Id*.

    C.  <u>Failure to Join Indispensable Parties - 12(b)(7) and 19(a)</u>

A movant must show that the plaintiff has failed to join a party under Fed.R.Civ.P. 19 in order to prevail on a Fed.R.Civ.P. 12(b)(7) Motion to Dismiss. Fed.R.Civ.P. 19(a) states, in material part, that the following are:

> (a) Persons Required to Be Joined if Feasible.

>> Required Party. A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

>>> (A) in that person's absence, the court cannot accord complete relief among existing parties; or

>>> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: as a practical matter impair or impede the person's ability to protect the interest; leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

F.R.Civ.P. 19(a).

When reviewing a motion brought pursuant to Fed.R.Civ.P. 12(b)(7), the Court must accept the allegations in the Complaint as true and draw all reasonable inferences in favor of the non-moving party. *Pittsburgh Logistics Sys., Inc. v. C.R. England, Inc.,* 699 F.Supp.2d 613, 618 (W.D. Pa. 2009). In addition, a Court may consider "relevant, extra-pleading evidence" during

its evaluation of a Fed.R.Civ.P. 12(b)(7) motion. *Citizen Band Potawatomi Indian Tribe of OK v. Collier*, 17 F.3d 1292, 1293 (10th Cir. 1994). Defendants argue that some of the named representatives have failed to join their spouses who, they argue, must be joined if feasible.

III. FDIC MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

The FDIC took over as receiver for GNBT in 2004. The FDIC argues that several Plaintiffs, who have loans that originated with GNBT, failed to file a claim with the FDIC as required by the Financial Industry Reform and Recovery Act, ("FIRREA"), 12 U.S.C. § 1821. The FDIC argues that Plaintiffs' claims are barred by their failure to exhaust administrative remedies. Although the FDIC does acknowledge that seven Plaintiffs filed claims, the FDIC notes that it disallowed those claims. Even if any one of those claims should be allowed, the FDIC argues that FIRREA does not allow those seven Plaintiffs to pursue their administrative claims on a class-wide basis.

Plaintiffs contend that FIRREA does allow claims to be administratively pursued on a class-wide basis. In the alternative, Plaintiffs argue that the FDIC should be estopped from asserting this defense at this juncture, because of its continued participation in this litigation, and because of its failure to provide Plaintiffs with sufficient notice of the receivership.

A. Failure to Exhaust Administrative Remedies Generally

"FIRREA, which was passed in response to the savings and loan crisis of the 1980s, gives the FDIC the authority to act as a receiver or conservator for failed institutions." *Tellado v. IndyMac Mtg. Svcs.*, 707 F.3d 275, 279, (3d Cir. 2013). "The statute also creates an administrative claims process for institutions in receivership and limits judicial review of certain

claims." *Id.*, citing 12 U.S.C. § 1821(d)(3)-(13). The United States Court of Appeals for the Third Circuit interpreted Section 1821(d)(13) to be "a statutory exhaustion requirement: in order to obtain jurisdiction to bring a claim in federal court, one must exhaust administrative remedies by submitting the claim to the receiver in accordance with the administrative scheme for adjudicating claims detailed in Section 1821(d)." *Id.*, (citing *Nat'l Union Fire Ins. Co. v. City Sav., F.S.B.,* 28 F.3d 376, 383 (3d Cir. 1991)). The District Court has jurisdiction to review the claim *de novo* only after a claim has been filed with the FDIC and processed. *Rosa v. Resolution Trust Corp.*, 938 F.2d 383, 392, n. 11.

Turning to the instant matter, of the forty three (43) named Plaintiffs, only twenty-five (25) had loans that were originated by GNBT. Of these 25, as set forth above, only a handful filed claims with the FDIC post-receivership. Therefore, the question becomes, whether these claims satisfy the administrative exhaustion requirement and, if so, can they constitute class claims under FIRREA.

As to the first question, the FDIC disallowed the claims of the seven named representatives who filed claims. The FDIC argues that after the disallowance, FIRREA requires Plaintiffs to take some affirmative action to continue their pre-receivership lawsuits. Plaintiffs contend that they are not required to take any affirmative action. Rather, Plaintiffs argue that the expiration of the claims period, which accompanies the stay is, in itself, a continuation of the action as defined by the statute.

No authority from the Court of Appeals for the Third Circuit defines the term "continue" under FIRREA. However, persuasive authority suggests that Plaintiffs have failed to comply

with 12 U.S.C. § 1821(d)(6)(B), which requires Plaintiffs to "continue an action commenced before the appointment of a receiver" after the notice of disallowance.  *See Holmes v. FDIC*, 861 F.Supp.2d 955 (E.D. Wis. 2012); and *Dougherty v. Deutsche Bank Nat.*, 2011 WL 3565079 (E.D. Pa. Aug. 12, 2011).

### B.  Exhaustion - Class Claims

Moreover, pursuant to FIRREA, claims cannot be filed on a class-wide basis.  The FDIC argues that FIRREA, by its silence on class claims, is analogous to the Bankruptcy Code, and therefore, impliedly prohibits class-wide claims.  The GNBT Plaintiffs contend that, pursuant to Rule 23, class-wide claims can be properly maintained on a class-wide basis.  In the alternative, the GNBT Plaintiffs contend that if class-wide claims are held to be improper, the FDIC should not be allowed to pursue this defense because the FDIC failed to provide the individual notice required by FIRREA.  The GNBT Plaintiffs argue that the FDIC must mail individual notice to each GNBT class member and then accept otherwise untimely claims.

The Court finds that neither FIRREA nor Rule 23 authorize claims against the FDIC to be filed on a class-wide basis.  With regard to FIRREA itself, the Court of Appeals for the Third Circuit has suggested in other contexts that "in the absence of more specific legislative authority, in interpreting FIRREA we will apply the definition of 'claim' . . . contained in the Bankruptcy Code . . . ."  *Nat'l Union Fire Ins. Co. v. City Sav., F.S.B*., 28 F.3d 376, 386-87 (3d Cir. 1994). The Court of Appeals suggested, in an unpublished decision, that claims may not be filed on a class-wide basis under the Bankruptcy Code.  *In re W.R. Grace & Co.,* 316 Fed. Appx. 134 (3d Cir. 2009).  In *W.R. Grace,* the Court reasoned that "the authority to act for a class pursuant to

Rule 23 does not imply any authorization to file a proof of claim for an individual in bankruptcy proceedings." *Id*. at 136.

Further, the Rules Enabling Act prohibits the Federal Rules from expanding any substantive rights. The Rules Enabling Act, which gives the judicial branch the power to promulgate the Federal Rules of Civil Procedure, requires that these rules "not abridge, enlarge, or modify any substantive right." 28 U.S.C. § 2072. If read as the Plaintiffs suggest, Rule 23 would effectively trump FIRREA's administrative scheme and thereby effectively abridge FIRREA and enlarge the class members rights against the FDIC. As a matter of first impression, the Court finds that, like the Bankruptcy Code, FIRREA does not authorize the pursuit of claims on a class-wide basis.

C. <u>Waiver Based on Estoppel and Lack of Notice</u>

Plaintiffs argue that the FDIC should be estopped from raising its attack on subject matter jurisdiction because of the FDIC's continued participation in this litigation. This argument is specious. It is well established that this Court's "subject matter jurisdiction cannot be expanded to account for the parties' litigation conduct." *Grupo Dataflux v. Atlas Global Group, L.P.,* 541 U.S. 567, 570 (2004) (internal quotations and citations omitted); see also *Insurance Corp. of Ireland, Ltd. v. Campagnie des Bauxites de Guinee,* 456 U.S. 694 (1982); and *American Fire & Casualty Co. v. Finn*, 341 U.S. 6 (1951).

It is equally well established that if, at any time prior to final judgment, it appears that there is no longer subject matter jurisdiction, a Court must immediately dismiss the action and, in

fact, is powerless to do otherwise.  As the Supreme Court has stated, in two cases nearly 100 years apart:

> [T]he rule, springing from the nature and limits of the judicial power of the United States is inflexible and without exception, which requires this court, of its own motion, to deny its jurisdiction, and, in the exercise of its appellate power, that of all other courts of the United States, in all cases where such jurisdiction does not affirmatively appear in the record.

*Insurance Corp. of Ireland, Ltd.*, 456 U.S. at 702, quoting *Mansfield, Coldwater & Lake Michigan Ry. v. Swan*, 111 U.S. 379, 382 (1884).

Plaintiffs argue in the further alternative that the FDIC failed to give the individual notice required by FIRREA.  Plaintiffs argue, therefore, that they should be excused from exhausting their administrative remedies.

The FDIC argues that it provided notice by:  (1) publishing notice of the receivership in a Tallahassee, Florida area newspaper; (2) mailing notice of the receivership to the class members' attorneys and to the opt out Plaintiffs' attorneys; and (3) substituting itself for GNBT in this action.

The Court of Appeals for the Third Circuit has not addressed this issue.  Under FIRREA, there are two separate and distinct procedures for notice – one governing notice of the receivership, and the other governing notice of the claims' bar date and the need to file claims with the receiver.

When the FDIC takes over a failed bank as a receiver, FIRREA mandates that the FDIC must first give notice that it has been so appointed. 12 U.S.C. § 1821(d)(5)(C)(ii). Then, the receiver must notify creditors that they must "present their claims, together with proof" by a specified date. 12 U.S.C. §§ 1821(d)(3)(B)(1), 1821(d)(3)C). Courts that have addressed the issue have consistently interpreted the two provisions as separate requirements having separate remedies. See *infra.*

Section 1821(d)(5)(C)(ii)(I) provides that the receiver may not disallow a claim as untimely if "the claimant did not receive notice of the appointment of the receiver in time to file such claim before" the bar date. Section 1821(d)(5)(C)(ii)(I). Importantly, this section does not proscribe the form of notice necessary to satisfy this provision. There is no dispute that the FDIC did mail notice to class counsel upon being appointed receiver for GNBT.

Section 1821(d)(3)(C), requiring notice to creditors, applies only to the creditors' need to file claims with the FDIC before the bar date. FIRREA requires that the FDIC "promptly publish a notice to the depository institution's creditors to present their claims, together with proof, to the receiver by a date specified in the notice," followed by republication approximately one or two months later. 12 U.S.C. § 1821(d)(3)(B). It must also mail a similar notice "to any creditor shown on the institution's books . . . ." Section 1821(d)(3)(C). The statute does not provide any penalties if the FDIC fails to comply with the notice requirements.

Plaintiffs argue that the individual GNBT claimants both appeared on the banks' books and, because Plaintiffs were members of a then certified class, were easily discoverable by the FDIC. Under § 1821(d)(5), they argue, the claims of absent members cannot be disallowed

35

because Plaintiffs received no notice of the bar date. Plaintiffs further argue that due process requires that they should be given individual notice consistent with Rule 23.

Most Courts that have considered the notice provisions of FIRREA have compared § 1821(d)(3)(C) to § 1821(d)(5) and concluded that, because the latter contains a statutory penalty for failure to comply and the former does not, Congress did not intend to provide a remedy for violations of § 1821(d)(3)(C). *See Freeman v. FDIC*, 56 F.3d 1394, 1402 (D.C. Cir. 1995); *Intercontinental Travel Mktg. v. FDIC*, 45 F.3d 1278 (9th Cir. 1994); *Meliezer v. Resolution Trust Corp.* 952 F.2d 879, 882-82 (1st Cir. 1992).

Further, the remedy provided by § 1821(d)(5) for claimants has been construed as requiring only actual notice of the receivership, rather than mailed individual notice. Substitution of the receiver into a pending lawsuit has been held to be sufficient actual notice to parties in that action. *See Tri-State Hotels v. FDIC*, 79 F.3d 707, 716 (8th Cir. 1996) (exhaustion of administrative remedies not required when claimant had actual notice); *Freeman*, 56 F.3d at 1404 (actual notice of receivership put plaintiffs on inquiry notice of claims bar date); and *Intercontinental Travel Mktg.*, 45 F.3d at 1281 (stipulation of substitution provided notice of receivership). Publication in local newspapers is sufficient notice of the receivership. *Tillman v. Resolution Trust Corp.*, 37 F.3d 1032, 1036 (4th Cir. 1994) (holding that evidence of publication in local newspapers precludes defense of lack of notice of receivership). Further, notice was given to class counsel for a then certified class. Although Plaintiffs attempt to argue that individual notice to each class member was required, this argument makes no sense under FIRREA or the Rules of Professional Conduct. Counsel for the FDIC was almost certainly

barred by the Rules of Professional Conduct from directly communicating with absent class members. At that time, they were adverse parties the FDIC knew to be represented after Rule 23 certification. Instead, the FDIC sent notice to Plaintiffs' counsel. Accordingly, Plaintiffs' argument that they should be excused from FIRREA's administrative exhaustion requirement due to lack of notice is without merit.

## IV. ALL DEFENDANTS' MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

### A. Personal Bankruptcies - Lack of Standing

Defendants argue that seventeen (17) out of forty-three (43) named representatives have filed for personal bankruptcy and failed to list this action as an asset of the bankruptcy estate. Plaintiffs concede that these representatives have filed for bankruptcy. Plaintiffs further concede that their failure to list this action as an asset means they are not the "real party in interest." *Killmeyer v. Ogelbay Norton Company*, 817 F.Supp.2d 681 (W.D. Pa. 2011).

However, Plaintiffs contend, that they should be given time to reopen their bankruptcies, and substitute the bankruptcy trustee as the real party in interest. Plaintiffs request that this Court wait until final judgment to require Plaintiffs to reopen their bankruptcy proceedings. This would be unprecedented.

Plaintiffs submit that one representative plaintiff, Rowena Drennen, has reopened her bankruptcy and that the Trustee has abandoned this claim to her. On this record, it appears that Ms. Drennen may have successfully reopened the relevant bankruptcy proceeding, and therefore, may be the real party in interest for her claim. Accordingly, her individual claim survives at this

juncture. The remainder of the claims of those Plaintiffs who are not the real parties in interest are dismissed.

### B. Loans Not Originated or Assigned to Defendants

Plaintiffs concede that they lack standing against some Defendants, and therefore, they concede that they can only pursue claims against those Defendants who either originated or were assigned their loans. Accordingly, all Plaintiffs' claims against a Defendant that did not issue or otherwise acquire their loans are dismissed for lack of standing.

### C. RESPA

Defendants contend that Plaintiffs have failed to state a claim for RESPA violations. Defendants argue that Plaintiffs' claims regarding discount fees are not settlement services under RESPA. Defendants further argue that Plaintiffs' RESPA claim fails because there is no allegation that the fees were split among entities. Defendants also contend that Plaintiffs' arguments in support of their kickback claims fail.

Plaintiffs allege RESPA violations related to two different sections of the statute, which govern two different types of fees. Broadly speaking, the fees are: (1) loan origination and other loan fees and (2) title fees. The first are often referred to as "Section 800" fees, based upon the section of the HUD - 1 form where they are located. The other type of fee is a "Section 1100" fee.

In *Freeman v. Quicken Loans*, 132 S.Ct. 2034 (2012), the United States Supreme Court held that "Section 2607 (b) [which governs Section 1100 fees] unambiguously covers only a settlement service provider's splitting of a fee with one or more other person; it cannot be

understood to reach a single provider's retention of an unearned fee." *Id.* at 2040 (footnote omitted). Defendants contend that this holding is fatal to Plaintiffs' Section 1100 claims. Plaintiffs only real response appears to be that the majority of their RESPA claims are Section 800 claims. Accordingly, pursuant to *Freeman*, Plaintiffs' Section 1100 claims, which allege only a single provider's retention of an unearned fee, are properly dismissed.

### D. Failure to Join Spouses

Defendants argue that Plaintiffs Edward Kruszka and Richard Montgomery should be dismissed pursuant to Fed.R.Civ.P. 12(b)(7) because their spouses have not been joined. Plaintiffs contend that Defendants have failed to meet their burden of proving that spouses are "necessary and indispensable parties" whose joinder is not feasible under Rule 19. "The moving party bears the burden of showing that a non-party is both necessary and indispensable." *Pittsburgh Logistics Systems, Inc. v. C.R. England, Inc.,* 669 F.Supp.2d 613, 618 (W.D. Pa 2009).

The plain language of Rule 19(a) supports Defendants' position. Plaintiffs have not joined the spouses of Mr. Kruszka and Mr. Montgomery, nor have they identified why joinder is not feasible. Accordingly, their claims are dismissed.

### E. Timeliness - RESPA and TILA

#### 1. One Year Statute of Limitations

Much ink has been spilled on this issue. Defendants argue that Plaintiffs did not file any case within the one-year statute of limitations applicable to RESPA actions and to TILA actual damages actions under § 1640(e) of that statute. Plaintiffs contend that the Court of Appeals

comments, albeit in *dicta*, regarding the applicability and interplay of the relation-back theory and class action tolling make this issue inappropriate for resolution on a Fed.R.Civ.P. 12(b)(6) Motion. Plaintiffs further point to recent decisions which hold that, under the proper circumstances, Plaintiffs would be entitled to equitable tolling: *Riddle v. Bank of America*, No. 12-cv-1740, 2013 WL 1482668 (E.D. Pa. April 11, 2013); *Barlee v. First Horizon National Corp.,* No. 12-cv-3045, 2013 WL 1389747 (E.D. Pa. Apr. 5, 2013); and *Barlee v. First Horizon National Corp.,* No. 12-cv-3045, 2013 WL 706091 (E.D. Pa. Feb. 27, 2013). The Court of Appeals for the Third Circuit observed in this case that "because the question of equitable tolling generally requires consideration of evidence beyond the pleadings, such tolling is not generally amenable to resolution on a Rule 12(b)(6) Motion." *In re Community Bank*, 622 F.3d 275, 301-02 (3d Cir. 2010). Accordingly, this part of Defendants' Motion to Dismiss is denied, without prejudice to Defendants' right to assert this defense on a fully developed record.

2. Rescission

Defendants argue that Plaintiffs have failed to state a claim for rescission under § 1635(f) of TILA because: (1) rescission is subject to a statute of repose which cannot be tolled for any reason; (2) the right to rescind is barred by Plaintiffs' refinancing of the loans at issue; and (3) Plaintiffs have failed to tender back.

As to the latter two arguments, evaluation of these claims would require an inquiry into factual issues outside the allegations of the Joint Consolidated Amended Complaint. Plaintiffs contend that Defendants Rule 12(b)(6) Motions on this issue should be denied.

With regard to the issue of equitable tolling, Plaintiffs contend they are seeking to apply class action, or *American Pipe* tolling (see *American Pipe and Constr. Co. v. Utah,* 414 U.S. 538 (1974)), which they argue can trump a statute of repose. On this issue, the Court of Appeals for the Third Circuit recently held that a TILA claim for rescission need not be filed in Court within three (3) years, but rather, the plaintiffs need only provide written notice to their lender within three years. *Sherzer v. Homestar Mtg Services*, 707 F.3d 255 (3d Cir. 2013).

In order to evaluate this Motion, the Court would be required to engage in a detailed analysis of whether, and when, each putative class member who seeks rescission provided written notice to their lender. This inquiry is not appropriate for resolution on a Motion to Dismiss. Accordingly, this part of Defendants' Motion to Dismiss is denied, without prejudice to Defendants' right to assert this defense on a fully developed record.

F.  TILA and RICO

Defendants argue that Plaintiffs have failed to state a claim upon which relief can be granted under either TILA or RICO. Plaintiffs contend that there are numerous factual issues in dispute on this issue which preclude granting a Rule 12(b)(6) Motion to Dismiss. In this case, the Court of Appeals has repeatedly emphasized that a statute of limitations defense should not be evaluated at this stage of the pleadings. See, *In re Community Bank of Northern Virginia*, 622 F.3d 275, 292-93 (3d Cir. 2010). Accordingly, this part of Defendants' Motion to Dismiss is denied, without prejudice to Defendants' right to assert this defense on a fully developed record.

## V. CONCLUSION

For the reasons set forth above, the Court entered its Order (doc. no. 605), on the then-pending Motions to Dismiss (doc. nos. 516 and 520), on June 12, 2013. That Order is incorporated by reference as if fully set forth herein.

s/ Arthur J. Schwab
Arthur J. Schwab
United States District Judge

cc: All Counsel of Record