**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: COMMUNITY BANK OF NORTHERN VIRGINIA SECOND MORTGAGE LENDING PRACTICES LITIGATION | MDL No. 1674<br><br>Case No. 03-0425<br>Case No. 05-0688<br><br>Hon. Arthur J. Schwab<br><br>THIS DOCUMENT RELATES TO ALL MDL ACTIONS |

**AMENDED MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
<u>UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT</u>**

## **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................1

II.     BACKGROUND .................................................................................................2

        A.      Events Preceding the Filing of the Joint Consolidated Amended Complaint..........2

        B.      Developments Since the Filing of the Joint Consolidated Amended Complaint.....5

        C.      Terms of the Settlement .................................................................7

        D.      Report on the Notice Process and Responses Received ..........................................8

III.    APPLICABLE STANDARDS ............................................................................9

IV.     THE SETTLEMENT SHOULD BE APPROVED BECAUSE IT IS
        FAIR, REASONABLE AND ADEQUATE....................................................................12

        A.      The *Girsh* Factors Support The Settlement .........................................................12

                1.      Continued Litigation Would Be Long, Complex And Expensive .............12

                2.      The Reaction Of The Class To The Settlement Has Been Favorable........13

                3.      The Stage of the Proceedings and the Amount of Discovery
                        Completed .................................................................14

                4.      Plaintiffs Faced Risk in Establishing Liability and Damages...................15

                5.      The Risks of Maintaining A Certified Class Through Trial. ....................16

                6.      Defendant's Ability to Withstand a Greater Judgment.............................16

                7.      Reasonableness of the Settlement in Light of the
                        Best Possible Recovery and All Attendant Risks of Litigation ................17

        B.      Additional Factors from *In re Prudential* and *In re Baby Products* Support
                the Settlement.................................................................19

IV.     CONCLUSION.....................................................................21

# TABLE OF AUTHORITIES

*Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30 (3d Cir. 1971) ......................................10

*Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304 (3d Cir. 1993) ................................................10, 14, 15

*Califano v. Yamasaki*, 442 U.S. 682 (1979) ................................................................................10

*Ehrheart v. Verizon Wireless*, 609 F.3d 590 (3d Cir. 2010) ............................................................9

*General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147 (1982)..........................................10

*Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975)..........................................10, 12, 13, 15, 17, 18, 19

*In re Baby Products Antitrust Litig.*, 708 F.3d 163 (3d Cir. 2013)..........................................19, 20

*In re Cendant Corp. Litig.*, 264 F.3d 201, 232 n. 18 (3d Cir. 2001)..............................................11

*In re Chambers Development Securities Litig.*, 912 F. Supp. 822 (W.D. Pa. 1995) ....................12

*In re Community Bank of Northern Virginia*, 418 F.3d 277 (3rd Cir. 2005).................................. 4

*In re Community Bank of Northern Virginia*, 795 F.3d 380 (3d Cir. 2015) ...................................4

*In re Community Bank of Northern Virginia, et al.,* 622 F.3d 275 (3d Cir. 2010) .................6, 16

*In re First Commodity Corp. of Boston Customer Accounts Litig.*,
    119 F.R.D. 301 (D.Mass. 1987)...............................................................................................13

*In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*,
    55 F.3d 768 (3d Cir.), *cert. denied*, 516 U.S. 824 (1995) ..................................................10

*In re Prudential Ins. Co. of Am. Sales Practice Litig. Agent Actions*,
    148 F.3d 283 (3d Cir. 1998).............................................................................................10, 19

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F.Supp. 450 (D.N.J. 1997) .............12

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004) ...........................................11

*In re Warner Communications Sec. Litig.*, 618 F.Supp. 735 (S.D.N.Y. 1985),
    *aff'd*, 789 F.2d 35 (2d Cir. 1986)..........................................................................................15

*Jackson v. Wells Fargo Bank, N.A.*, 136 F.Supp.3d 687 (W.D. Pa. 2015)............................13, 16

*Lazy Oil, Co. v. Witco,* 166 F.3d 581 (3d Cir. 1999) ..................................................................18

*Lazy Oil, Co. v. Witco*, 95 F.Supp.2d 290 (W.D. Pa. 1997) ...................................................17

*McDonough v. Toys R Us, Inc.*, 80 F Supp.3d 626 (E.D. Pa. 2015).........................................14, 16

*O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266 (E.D. Pa. 2003)......................................14

*Pennwalt Corp. v. Plough, Inc.*, 676 F.2d 77 (3d Cir. 1982)......................................................9

*Reibstein v. Rite Aid Corp.*, 761 F.Supp.2d 241 (E.D. Pa. 2011) .................................................16

*State of West Virginia v. Chas. Pfizer & Co.*, 314 F.Supp. 710 (S.D.N.Y. 1970),
    *aff'd,* 440 F.2d 1079 (2d Cir.), *cert. denied*, 404 U.S. 871 (1971) ...................................15

*TBK Partners, Ltd. v. Western Union Corp.*, 517 F. Supp. 380 (S.D.N.Y. 1981),
    *aff'd,* 675 F.2d 456 (2d Cir. 1982) ...................................................................................13

*Walsh v. Great Atlantic & Pacific Tea Co.,* 726 F.2d 956 (3d Cir. 1971)....................................10

*Weiss v. Mercedes-Benz of N. America, Inc.*, 899 F.Supp. 1297 (D.N.J.), *aff'd without op.*,
    66 F.3d 314 (3d Cir. 1995)............................................................................................10, 11

## <u>Other Authorities</u>

*Manual for Complex Litigation, Third* § 30.43 (1995) .................................................................11

Through their undersigned counsel, the Class Representatives[1] (also referred to as "Plaintiffs") respectfully submit this Memorandum of Law in Support of their motion for final approval of a class action settlement between the certified classes (General and Sub-Classes) and Defendant PNC Bank, National Association ("PNC").

## I.      INTRODUCTION

This consolidated action relates to 26,698 second mortgage loans originated by Community Bank of Northern Virginia ("CBNV") between 1998 and 2002.  The Class Representatives, on behalf of themselves and the unnamed Class Members, allege that the loans and the activities of those involved in originating the loans violated the Real Estate Settlement Procedures Act ("RESPA"), the Truth In Lending Act ("TILA"), the Home Ownership and Equity Protection Act ("HOEPA"), and the Racketeer Influenced and Corrupt Organizations Act ("RICO").  This matter has been litigated for over fifteen years.  There have been three primary appeals to the Third Circuit including the most recent decision affirming this Court's order certifying this matter as a litigation class.  In August 2016, Plaintiffs entered into a class action settlement agreement with defendant, PNC, the successor to CBNV.  The agreement calls for an Arbitration Panel to select one of the two amounts proposed separately by each party; the chosen amount will become the final settlement amount.  The fund will compensate Plaintiffs and Class Members in exchange for the resolution and release of all remaining claims in this action.

The parties also consented to refer to the Arbitration Panel the issues of requested awards of attorneys' fees, expenses and incentive payments.  Counsel for the Plaintiffs, who have been

---

[1] The named Plaintiffs/Class Representatives are: Brian Kessler, Carla Kessler, Philip Kossler, Jeannie Kossler, John Picard, Rebecca Picard, Kathy Nixon, John Nixon, Flora Gaskin, Tammy Wasem, David Wasem, Bill Sabo, and Ellen Sabo.  A copy of the Final and Binding Settlement Jointly Agreed to Term Sheet, which was attached as Exhibit 1 to the Unopposed Motion for Preliminary Approval of Class Action Settlement is attached hereto for the Court's convenience as **Exhibit 13**.

appointed class counsel by this Court ("Class Counsel"), are requesting an award of 35% of the final settlement amount as attorneys' fees and payment of known expenses totaling $465,416.81 and unknown expenses, which will include the following categories of expenses: (a) one half the fees and costs for the three-person Panel (the other half will be paid by PNC); (b) one half of the Special Master's and the Mediator's fees; (c) additional litigation expenses and costs reasonably incurred by Class Counsel to prepare for and conduct the arbitration and the final approval hearing; (d) settlement administration expenses; and (e) costs of providing notice to the class.

Class Counsel also request that each of the thirteen named Plaintiffs be paid $3,750.00 as an incentive award for their services to the General Class and Sub-Classes as named representatives. In conjunction with this motion, Plaintiffs have also filed their motion for the aforementioned awards pursuant to Fed. R. Civ. P. 23(h) and 54(d)(2).

For the reasons described below, the proposed class settlement should be approved and the final settlement fund determination should be referred to the Arbitration Panel.

## II.    BACKGROUND

### A.    Events Preceding the Filing of the Joint Consolidated Amended Complaint

This MDL proceeding originally began as six separate actions filed by Co-Lead Class Counsel Bruce Carlson (now of Carlson Lynch Sweet Kilpela & Carpenter, LLP, or "Carlson Lynch") and others in Pennsylvania courts. The first such action, known as *Davis v. Community Bank of Northern Virginia, et al.*, was filed on May 1, 2001. The *Davis* plaintiffs asserted class claims for, *inter alia*, a violation of the fee split and disclosure provisions of RESPA. A number of other cases filed by Mr. Carlson and others followed against CBNV and/or former co-defendant Guaranty National Bank of Tallahassee, all of which focused on RESPA fee split and kickback claims. Through removal or direct filings in federal court, all of the cases came to be pending in

this Court. In support of the cases, Class Counsel and their consultants performed an extensive investigation. The investigation included, *inter alia*, the following: the review of hundreds of loan files; the review of in excess of ten thousand pages of documents generated in various regulatory proceedings; interviews of more than twenty witnesses; extensive meetings with former insiders in the alleged second mortgage scheme; and frequent conversations with various journalists and regulators who were investigating the conduct at issue.

Around the same time that the Pennsylvania cases were being filed, Co-Lead Class Counsel Fred Walters and Walters Bender Strohbehn & Vaughan, P.C. ("Walters Bender") were also investigating the mortgage practices at issue. Walters Bender filed a Missouri class action against CBNV and Residential Funding Corporation ("RFC") in June 2001, *Avila v. Community Bank of Northern Virginia, et al.,* Case No. 00 CV 226639 (Circuit Court of Jackson County, Missouri at Independence), alleging claims for violations of Missouri's Second Mortgage Loans Act ("MSMLA"), but that case was ultimately dismissed.

In July 2003, the parties involved in the Pennsylvania cases reached a settlement (the "First Settlement"). The First Settlement contemplated a common fund in the approximate amount of $33 million. The First Settlement was preliminarily approved on July 1, 2003. (Doc. No. 8) On October 1, 2003, a number of class members represented by Walters Bender filed objections to the settlement and also moved to intervene as proposed class representatives. (Doc. No. 11)

The primary concern of the objectors was that the settlement released claims under TILA and HOEPA without adequate compensation. On December 4, 2003, the district court approved the First Settlement. (Doc. Nos. 104, 107) The Objectors appealed the approval of the settlement to the Third Circuit. As a result of the considerable efforts on both sides of the appeal, on August 11, 2005, the Third Circuit issued a lengthy precedential opinion vacating the settlement and

remanding the case to the district court. *In re Community Bank of Northern Virginia*, 418 F.3d 277 (3rd Cir. 2005) ("*In re CBNV I*"). Notably, while the settlement was vacated, the Third Circuit generally endorsed the class treatment of the RESPA and TILA/HOEPA claims upon remand.

Following the 2005 remand, the parties actively litigated the case to determine the "viability" of the TILA/HOEPA claims championed by the objectors. This included extensive work with expert witnesses to establish the factual predicates for the TILA/HOEPA claims.  *See, e.g.,* Doc. Nos.  142, 144-46, 174, 177-80, 184, 197-202.   In July 2006, plaintiffs represented by Carlson Lynch filed a motion for preliminary approval of a second settlement that provided additional compensation to the Class for the TILA/HOEPA claims (the "Second Settlement"). The Second Settlement contemplated a common fund of approximately $47 million. The district court granted preliminary approval of the Second Settlement on January 25, 2008.  (Doc. No. 285)

Borrowers represented primarily by Walters Bender objected to the Second Settlement, asserting that the additional compensation for the TILA/HOEPA claims remained inadequate. (Doc. No. 393)  The district court granted final approval of the Second Settlement on August 14, 2008.  (Doc. Nos. 434-36) On behalf of objecting class members, Walters Bender led a second appeal of the district court's approval of the settlement to the Third Circuit.  On October 20, 2010, the Third Circuit issued a second lengthy opinion, again vacating the district court's order certifying the Class and granting final approval of the Second Settlement. *See In re Community Bank of Northern Virginia,* 622 F.3d 275 (3d Cir. 2010) ("*In re CBNV II*"). Again, despite the remand, the Third Circuit generally endorsed the class treatment of the asserted claims.

Following the second remand in early 2011, counsel for the previously settling plaintiffs (led by Carlson Lynch) and counsel for the objectors (led by Walters Bender) had extensive conversations before ultimately concluding that the best interests of the Class dictated that all

plaintiffs, and all counsel for plaintiffs, collaborate so that all of the interests of the Class Members were fully aligned and there could be no credible claim that the interests of the Class were not being adequately represented. When notified of this alliance, the defendants exercised their rights under the abandoned settlement agreement to compel additional mediation. That mediation was not successful.

**B.      Developments Since the Filing of the Joint Consolidated Amended Complaint**

The Class Representatives filed their Joint Consolidated Amended Class Action Complaint on October 4, 2011 (the "Complaint") and on October 18, 2011 filed their First Amended RICO Case Statement.  (Doc. Nos. 507, 511)  Plaintiffs brought claims under RESPA, TILA, HOEPA, and RICO, alleging that, in connection with its origination of second mortgage loans, CBNV failed to disclose affiliated business arrangements, unlawfully kicked back settlement charges to third parties, made inaccurate loan disclosures, understated the Finance Charge and Annual Percentage Rate ("APR") in federally-mandated loan disclosures, and otherwise operated an illegal racketeering enterprise in violation of federal law. As a result of these alleged violations, Plaintiffs sought damages on behalf of themselves and all other borrowers from CBNV in connection with the 26,698 second mortgage loans at issue.

Defendant PNC Bank, National Association, as successor to CBNV, denied that CBNV engaged in any wrongful conduct or that it violated any laws while originating the loans at issue. PNC filed a motion to dismiss the Complaint (Doc. No. 520), which this Court granted in part and denied in part on June 12, 2013. (Doc. No. 605; *see also* Opinion, Doc. No. 610).   Plaintiffs then moved for class certification on their remaining claims.  (Doc. Nos. 607, 611). This Court granted the motion on July 31, 2013, certifying a General Class and five Sub-Classes.  (Doc. No. 618).  PNC appealed that order to the Third Circuit, which issued its opinion affirming the class

certification order on July 29, 2015.  *See In re Community Bank of Northern Virginia*, 795 F.3d 380 (3d Cir. 2015) ("*In re CBNV III*").  PNC filed a motion for rehearing en banc with the Third Circuit as well as a petition for writ of certiorari to the U.S. Supreme Court.  Both were denied.

On October 27, 2015, the Court entered its Order Amending Class Certification Order to clarify the end date for Sub-Class 5 (the RICO Sub-Class). (Doc. No. 698).  The Parties attempted several settlement negotiations and mediations between the filing of the Complaint and the Third Circuit's class certification affirmance; however, no agreement was reached.

The parties engaged in extensive discovery in 2013 and 2014, including the depositions of most of the Named Representatives, former officers and employees of CBNV, officers and employees of affiliated loan production entities, and officers and employees of related title companies that served as settlement agents on the loans at issue.  Additional depositions and expert discovery took place in 2015 and 2016.  In total, more than 30 depositions were taken in several different states, several expert reports were procured, and nearly two million pages of documents were produced by PNC, former co-defendants, or third parties.

In April 2016, PNC filed a motion for summary judgment and a motion to decertify the Classes.  (Doc. Nos. 711, 714).  Plaintiffs opposed both motions.  (Doc. Nos. 729-32; 735)  As ordered by the Court, while these motions were pending the Parties resumed settlement negotiations supervised by Dan Sandman, who had presided over previous mediations. (Doc. Nos. 744-45) The initial sessions did not result in a settlement, but on August 8, 2016, with the agreed upon involvement of the Court in a further mediation session, the Parties reached an agreement. (Doc. Nos. 752, 755).

> **C.     Terms of the Settlement**

The settlement will result in the availability of cash relief to members of the General Class and Sub-Classes previously certified by this Court.  The final amount of the class-wide relief will be determined after an adjudication of Plaintiffs' claims by a three-person arbitration panel (the "Panel") selected by the Court. (SA ¶¶ 1, 2).[2] The Parties have agreed that this settlement procedure will be conducted in the form of a "high-low" arbitration,[3] in which the Panel will select either Plaintiffs' valuation of the case or PNC's valuation of the case as the most appropriate amount at which the case will be settled after considering Plaintiffs' evidence and argument as to liability and damages and PNC's defenses and counter-arguments to the same.  (SA ¶ 3).

Plaintiffs submitted a total valuation of seventy million dollars ($70,000,000); PNC submitted a total valuation of twenty-four million dollars ($24,000,000).  Pursuant to the terms of the Settlement Agreement, on or before March 31, 2017, one of these two valuation numbers must be unanimously selected by the Panel as the final settlement amount in this case.  (SA ¶ 4).  The Panel will also determine how the settlement amount is allocated among the certified Sub-Classes. (*Id.*).  The parties also consented to have the issues of attorneys' fees, expenses and incentive payments determined by the Panel.  (*Id.* at ¶ 5). As stated in the Court-approved Class Notice, Class Counsel will request an attorney fee award of 35% of the final settlement amount along with known expenses not to exceed $465,416.81 and unknown "future" expenses that will relate to and stem from the arbitration and that will include the following categories of expenses: (a) one half the fees and costs for the three-person Panel (the other half will be paid by PNC); (b) one half of the Special Master's and the Mediator's fees; (c) additional litigation expenses and costs reasonably incurred by Class Counsel to prepare for and conduct the arbitration and the final

---

[2] The Parties have agreed to evenly divide the fees and costs for the Panel.  (SA ¶ 4).
[3] Also known as "pendulum," "baseball," or "final offer" arbitration.

approval hearing; (d) settlement administration expenses; and (e) costs of providing notice to the class.

After the final settlement amount is determined by the Panel, Class Counsel will use their best efforts to accomplish direct distribution of all available settlement proceeds to Class Members. No funds will revert to PNC. If there is a small amount of settlement funds remaining after all reasonable efforts have been made to locate and distribute payment to Class Members, the parties agreed that the remaining funds will be distributed *cy pres* to not-for-profit entities which have objectives related as closely as possible to the purpose of the laws implicated by this case and the remedies sought by the Class. Should this step be necessary, these beneficiaries will be proposed by Class Counsel and are subject to final approval by the Court.

On August 19, 2016, the Court appointed Arthur H. Stroyd, Jr., John R. Gall, and Hon. Robert J. Cindrich (ret.) as the three-member Arbitration Panel. (Doc. No. 758) The Court granted Plaintiffs' motion for preliminary approval of the settlement agreement on September 14, 2016. (Doc. No. 762).

### D.    Report on the Notice Process and Responses Received

After the Court granted preliminary approval to the settlement, Class Counsel retained well-known settlement administrator Tilghman & Company to distribute direct mail notice to the Class. On September 20, 2016, the administrator mailed 27,078 notices to the last known addresses of Class Members. Initially, 1,179 Notices were returned as undeliverable to the administrator. Of those 1,179 returned Notices 12 contained a forwarding address; those Notices were re-mailed. Of the remaining 1,167 returned Notices, the administrator located new addresses for 1,064 and re-mailed those Notices to the new addresses. *See* Affidavit of L. Stephens Tilghman, ¶¶ 5-8 (attached as **Exhibit 9**).

The notice explained the nature of the lawsuit and the terms of the settlement and provided the date and location of the December 13, 2016 final approval hearing, as well as directions for Class Members who wished to exclude themselves from the settlement or object to its terms. The notice specifically stated that exclusion requests and objections must have been postmarked by November 23, 2016.  The notice also included phone numbers and email addresses that Class Members could contact if they had questions.  (Doc. No. 761)

In response to the Notices sent out, there have been no objections to the Settlement filed with the Court and/or received by Class Counsel and only 9 borrowers as to 6 of the 26,698 Class loans requested for exclusion from the Settlement.  *See* Declaration of R. Frederick Walters, at ¶19.  The exclusion requests represent only .022 % of the total loans covered by the certified Classes.  A list of these borrowers is attached as **Exhibit C** to the Declaration of R. Frederick Walters.

## III.   APPLICABLE STANDARDS

There is a strong presumption in favor of voluntary settlement agreements and such agreements are specifically enforceable and broadly interpreted.  *Pennwalt Corp. v. Plough, Inc.*, 676 F.2d 77, 80 (3d Cir. 1982).  This presumption is especially strong in "class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation."  *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 595 (3d Cir. 2010).  Furthermore, the strong judicial policy in favor of class action settlements contemplates a circumscribed role for the district courts in settlement review and approval proceedings.  *Id.*

The Supreme Court has discussed the importance of class action lawsuits, explaining, "Class relief is peculiarly appropriate when the issues involved are common to the class as a whole and when they turn on questions of law applicable in the same manner to each member of the

class." *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 155 (1982) (internal quotation marks omitted).   Under these circumstances, "'the class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23.'"   *Id.* (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979).

In determining whether a proposed settlement warrants final approval, the Court must conclude that the proposed settlement is "fair, reasonable and adequate."   *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 316 (3d Cir. 1998). "Rule 23(e) imposes on the trial judge the duty of protecting absentees, which is executed by the court's assuring the settlement represents adequate compensation for the release of the class claims."   *Id.*   (citation omitted).  A number of well-settled factors guide the Court's fairness review.

While the approval of a proposed class action settlement is a matter within the sound discretion of the Court, *see Walsh v. Great Atlantic & Pacific Tea Co.,* 726 F.2d 956, 965 (3d Cir. 1971); *Girsh v. Jepson*, 521 F.2d 153, 156 (3d Cir. 1975); *Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30, 34 (3d Cir. 1971); *Weiss v. Mercedes-Benz of N. America, Inc.*, 899 F.Supp. 1297, 1300 (D.N.J.), *aff'd without op.*, 66 F.3d 314 (3d Cir. 1995), a strong judicial policy favors resolution of litigation short of trial.   *In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 805 (3d Cir.), *cert. denied*, 516 U.S. 824 (1995) ("*GM Trucks*") ("The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation.").  When a settlement is reached on terms agreeable to all parties, it is to be encouraged.   *Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1314 n.16 (3d Cir. 1993).

A federal district court within the Third Circuit has articulated the rationale for this policy as follows:

> [W]hen parties negotiate a settlement they have far greater control of their destiny than when a matter is submitted to a jury. Moreover, the time and expense that precedes the taking of such a risk can be staggering. This is especially true in complex . . . litigation.

*Weiss*, 899 F.Supp. at 1300-01. The Third Circuit has specifically instructed district courts to attach a "presumption of fairness" to a proposed settlement when the following factors are present: "(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004) (quoting *In re Cendant Corp. Litig.*, 264 F.3d 201, 232 n. 18 (3d Cir. 2001)); *see also Manual for Complex Litigation, Third* § 30.43 (1995).

The parties' proposed settlement enjoys a presumption that it is fair, adequate, and reasonable because all of the aforementioned elements are present. First, the settlement negotiations occurred at arm's length, supervised by an experience mediator and, in the late stages, the Court itself. Second, the parties conducted extensive discovery involving more than 30 depositions, several expert reports, and voluminous document productions, and only a few expert depositions remained outstanding at the time of settlement. Third, counsel on both sides have extensive experience in class action and other complex litigation, including specific experience in cases involving RESPA, TILA, HOEPA and other consumer protection laws. Finally, no objections were received to the proposed settlement and there were only 9 borrowers (on 6 of the 26,698 Class loans) (.022%) that excluded themselves from the settlement.

Although a court must independently evaluate a proposed settlement, the Court should credit the judgment of experienced counsel in doing so. Conversely, the Court must avoid

substituting its image of an "ideal settlement" for the views of the "compromising parties," and must keep in mind the fact that a settlement is, after all, "a compromise, a yielding of the highest hopes in exchange for certainty and resolution." *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F.Supp. 450, 534 (D.N.J. 1997).

## IV.   THE SETTLEMENT SHOULD BE APPROVED BECAUSE IT IS FAIR, REASONABLE AND ADEQUATE.

### A.   The *Girsh* Factors Support The Settlement.

The Third Circuit has adopted a set of nine factors to be considered in determining whether a proposed settlement is fair, reasonable and adequate: (1) the complexity and duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action; (7) the ability of the defendant to withstand a greater judgment; (8) the range of reasonableness of the settlement in light of the best recovery; (9) the range of reasonableness of the settlement in light of all the attendant risks of the litigation. *Girsh,* 521 F.2d at 157; *In re Chambers Development Securities Litig.*, 912 F. Supp. 822, 836-41 (W.D. Pa. 1995).

The application of these factors to the parties' proposed settlement demonstrates that it is fair, reasonable and adequate and should be approved.

### 1.   Continued Litigation Would Be Long, Complex, And Expensive.

The proposed settlement allows for a resolution of the claims at issue within the next three to four months in a manner that is fair, reasonable and adequate to the General Class and Sub-Classes.  This result will be accomplished at least months, and perhaps years, earlier than otherwise might be possible absent a settlement.  This litigation already has a protracted history, and without this settlement a jury trial would have been the last available method to resolve this action. Although no one knows for sure how long a trial would have taken, the parties' submissions in

connection with PNC's motion for summary judgment indicate a voluminous record which would have required substantial time and expense to develop during a trial. The parties submitted a total of 482 statements and responsive statements of fact along with 160 exhibits comprising more than 5,000 pages.   Moreover, due to the large number of out-of-state witnesses, the parties would have had to present a significant amount of testimony using transcripts or videotape.

Further, regardless of the actual length of trial, there would have almost certainly been a post-trial appeal which would have prolonged ultimate resolution for many months or years.

Courts have consistently held that, unless the proposed settlement is clearly inadequate, its acceptance and approval are preferable to the continuation of lengthy and expensive litigation with uncertain results. *Chambers,* 912 F. Supp. at 837; *see also TBK Partners, Ltd. v. Western Union Corp.*, 517 F. Supp. 380, 389 (S.D.N.Y. 1981), *aff'd,* 675 F.2d 456 (2d Cir. 1982).   Given the prospects for a jury trial and subsequent appeal, as well as the litigation risks involved, a settlement at this time is advantageous to the General Class and Sub-Classes.   *In re First Commodity Corp. of Boston Customer Accounts Litig.*, 119 F.R.D. 301, 314 (D. Mass. 1987).

This factor thus weighs in favor of approval of the proposed settlement.

## 2.    The Reaction Of The Class To The Settlement Has Been Favorable.

The Third Circuit and Western District of Pennsylvania have held that the response of the class to notice of a proposed settlement can be a significant factor under the *Girsh* paradigm. "Although the practical realities of a class action dictate a cautious approach to recognizing an inference of support based on the lack of a significant number of objectors, the receipt of only a small number of objections provides some support for the approval of a proposed settlement." *Jackson v. Wells Fargo Bank, N.A.*, 136 F.Supp.3d 687, 701-02 (W.D. Pa. 2015), appeal dismissed (Nov. 25, 2015). "The reaction of the class is perhaps the most significant factor to be weighed in

considering its [the settlement's] adequacy." *O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 294 (E.D. Pa. 2003).  Here, the reaction of the Class is overwhelmingly in favor of the settlement.  As noted above, there have been no objections to the settlement and only 9 borrowers (on 6 loans) have opted out (.022%).  *See* **Exhibit 3-C.**

### 3. The Stage of the Proceedings and the Amount of Discovery Completed

The stage of the proceedings and the amount of investigation and/or discovery completed is another factor to be considered in determining the fairness, reasonableness and adequacy of the settlement.  *GM Trucks*, 55 F.3d at 785.  This factor "captures the degree of case development that class counsel have accomplished prior to the settlement."  *Id.* at 813.  "Through this lens," the Third Circuit has written, "courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating."  *Id.*

In short, courts have found that a settlement reached late in the proceedings and after substantial discovery is more likely to be based on an informed understanding of the strengths and weaknesses of the case, and therefore is more likely to be fair and reasonable. *See McDonough v. Toys R Us, Inc.*, 80 F.Supp.3d 626, 643-44 (E.D. Pa. 2015); *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1314 (3d Cir. 1993) ("[P]ost-discovery settlements are more likely to reflect the true value of the claim and be fair.").

Here, the Parties reached a settlement late in the proceedings while PNC's motions for summary judgment and class decertification were pending. (Doc. No. 759) The Parties were poised to begin preparing for trial. Furthermore, almost all formal discovery was complete, including more than 30 depositions and the exchange and review of expert reports and nearly two million pages of documents. Only a few expert depositions remained to be taken at the time of settlement.

The amount of discovery completed at this advanced stage of proceedings allowed counsel for both parties to reach an informed appraisal of the value of the claims. This factor weighs in favor of the fairness, reasonableness, and adequacy of the settlement.

### 4.    Plaintiffs Faced Risk in Establishing Liability and Damages.

In assessing the fairness, reasonableness and adequacy of the settlement, the Court should balance the risks of establishing liability against the benefits afforded by the settlement, and the immediacy and certainty of an adequate recovery against the risks of continued litigation. *Girsh*, 521 F.2d at 157; *In re Warner Communications Sec. Litig.*, 618 F. Supp. 735, 741 (S.D.N.Y. 1985), *aff'd*, 789 F.2d 35 (2d Cir. 1986). As one court has noted, "no matter how confident one may be of the outcome of litigation, such confidence is often misplaced." *State of West Virginia v. Chas. Pfizer & Co.*, 314 F.Supp. 710, 743-44 (S.D.N.Y. 1970), *aff'd,* 440 F.2d 1079 (2d Cir.), *cert. denied*, 404 U.S. 871 (1971); *see also Bell Atlantic Corp.*, 2 F.3d at 1313 (potential of a large damage award is tempered by the possibility of not succeeding).

Here, PNC vigorously contested liability throughout the litigation. Although Plaintiffs and Class Counsel remained confident that PNC's liability could be established, victory on all claims was never a certainty. At the time of settlement, PNC's motion for summary judgment was pending and was directed against all claims. (Doc. Nos. 711-1) It is clear from the filings related to that motion that the parties had numerous disputes regarding not just the factual background of the claims, but also questions of law and its application to Plaintiffs' claims and PNC's defenses. Many of these disputes involved additional, subordinate questions of law or fact of major consequence to the viability of the claims.

This uncertainty surrounding liability and damages favors approval of the settlement.

### 5.     The Risks of Maintaining A Certified Class Through Trial.

Plaintiffs also faced the risk of class decertification before, during, and after trial.  Although the Third Circuit affirmed this Court's class certification order in *CBNV III*, PNC had a "post-discovery" class decertification motion pending at the time of settlement and under Rule 23, a class may be decertified at any time during the litigation.  Developments during trial could also have provided PNC with new or better arguments against class certification.

As such, the risk of class decertification weighs in favor of a finding that the proposed settlement is fair, reasonable, and adequate.

### 6.     Defendant's Ability to Withstand a Greater Judgment

There has been no formal discovery into PNC's ability to withstand a greater judgment. However, Courts within the Third Circuit have noted that this factor is only implicated when "a settlement in a given case is less than would ordinarily be awarded but the defendant's financial circumstances do not permit a greater settlement." *Reibstein v. Rite Aid Corp.*, 761 F.Supp.2d 241, 254 (E.D. Pa. 2011). Although the Defendant's financial condition is relevant, "just because defendants *could* pay more does not necessarily mean they should *have to* pay more than the parties negotiated to settle these claims." *Jackson v. Wells Fargo Bank, N.A*., 136 F. Supp. 3d 687, 705 (W.D. Pa. 2015), *appeal dismissed* (Nov. 25, 2015).  Courts regularly treat this factor as neutral and approve settlements as fair, even if the defendant could potentially afford a larger settlement. *See McDonough v. Toys R Us, Inc.*, 80 F.Supp.3d 626, 645 (E.D. Pa. 2015) (compiling cases).

Here, the parties' settlement is based on their respective assessments of the strengths and weaknesses of the claims and defenses and the risks and expenses of proceeding.  Evidence regarding PNC's financial condition was not considered by the parties as a basis to settle on terms less generous to the General Class and Sub-Classes than would otherwise be expected. Thus, this

19

factor does not weigh against a finding that the proposed settlement is fair, reasonable, and adequate.

### 7. Reasonableness of the Settlement in Light of the Best Possible Recovery and All Attendant Risks of Litigation

The last two *Girsh* factors are the reasonableness of the settlement in light of (i) the best possible recovery, and (ii) all the attendant risks of the litigation. Courts in the Western District have had regular occasion to opine on these specific *Girsh* factors. One of the most comprehensive analyses was set forth in *Lazy Oil, Co. v. Witco*, 95 F.Supp.2d 290, 339 (W.D. Pa. 1997), wherein Judge McLaughlin stated:

> The settlement amount here represents a percentage of Plaintiffs' experts' damages estimates that is well within the range typically approved by courts in passing on reasonableness. *See, e.g., Erie Forge & Steel, Inc. v. Cyprus Minerals Co.,* Civil Action No. 94-404 (W.D. Pa. December 23, 1996) (approving settlement of $3.6 Million where plaintiffs' expert estimated damages at $33 million); *Fox v. Integra Financial Corp.,* Civil Action No. 90-1504 (W.D. Pa. July 9, 1996) (approving settlement of $6.5 million where plaintiffs' best estimate of provable damages was $33 million); *In re Four Seasons Sec. Litig.,* 58 F.R.D. 19, 36-37 (W.D. Okla. 1972) ($8 million settlement approved, although claims exceeded $100 million); *Cagan v. Anchor Savings Bank FSB,* [1990 Transfer Binder] Fed. Sec. L. Rep. (CCH) 95,324 at 96,559, 1990 WL 73423 at *12-13 (E.D.N.Y. May 22, 1990) (approving $2.3 million dollar settlement over objections that 'best possible recovery would be approximately $121 million"); *Behrens v. Wometco Enterprises, Inc.*, 118 F.R.D. 534, 542 (S.D.Fla. 1988) ("The mere fact that the proposed settlement of $.20 a share is a small fraction of the desired recovery of $3.50 a share is not indicative of an inadequate compromise."), *aff'd* 899 F.2d 21 (11th Cir. 1990).
>
> In light of the well-recognized risks faced by litigants in proving liability and damages in cases of this type, courts have determined that a settlement can be approved even if benefits amount to a small percentage of the recovery sought. In *Detroit v. Grinell Corp.*, 495 F.2d 448, 455 (2d Cir. 1974), *impliedly overruled in non-relevant part by Missouri v. Jenkins,* 491 U.S. 274 (1989), the Second Circuit stated: 'The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved.' And, 'there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.' 495 F.2d at 455 n.2.
>
> Consequently, class settlements involving far smaller percentage recoveries have been approved. *See, e.g., Weinberger v. Kendrick,* 698 F.2d at 65 ($2.84 million

settlement upheld which, because of legal difficulties amounted to 'only a negligible percentage of the losses suffered by the class,' which were estimated at between $250 million and $1 billion); *Fisher Bros., Inc. v. Mueller Brass Co.,* 630 F.Supp. 493, 499 (E.D. Pa. 1985) (approving settlement of 0.2% of sales; *Behrens v. Wometco Enterprises, Inc.*, 118 F.R.D. at 542 (settlement of 5.7% of total damages); *Cagan v. Anchor Savings Bank FSB, supra.* (settlement of $2.3 million where estimated damages were $121 million); *Mersay v. First Republic Corp. of America* [1967-1969 Transfer Binder] Fed. Sec. L. Rep. (CCH) 92,304 at 97,443 (S.D.N.Y. 1968) (5-10%); *In re Four Seasons Securities Litig.,* 58 F.R.D. at 36-37 (settlement of less than 8% of estimated damages); *Bagel Inn, Inc.* v. *All Star Dairies,* 1982-1 Trade Cases (CCH) 64,512, 1981 WL 2185 at * 3 (D.N.J. 1981)(settlement of 8% of potential damages); *Feder v. Harrington,* 58 F.R.D. 171, 176 (S.D.N.Y. 1972) (Court approved settlement of 16% of 'realistic damages').

On appeal, the Third Circuit endorsed Judge McLaughlin's analysis, stating:

> From the objectors' point of view, our opinion should be devoted largely to a merits analysis of their objections to the settlement, measured by the standards outlined in *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975).  However, we dispose of that aspect of the case summarily, concluding that the *Girsh* factors are easily met and that the District Court did not abuse its discretion in approving the settlement . . . .
>
> ***
>
> We note specifically that the plaintiffs faced a not insignificant risk of losing a summary judgment motion if this case was not settled; of the possible exclusion of their damage experts following a *Daubert* hearing; and of an adverse verdict if the case reached trial . . . .

*Lazy Oil, Co. v. Witco,* 166 F.3d 581, 584, 588 (3d Cir. 1999) (emphasis added).

Here, Plaintiffs assert that their maximum recovery under all theories of liability (RESPA, TILA, HOEPA and RICO) could be in excess of $900 million dollars.  PNC, of course, disputes both liability and a large portion of Plaintiffs' damage calculation.  Hurdles to a full recovery include the aforementioned liability challenges, including a statute of limitations issue for some Class Members, as well as PNC's contention that certain of the damages sought are duplicative or discretionary.  While either of the agreed upon high-low settlement figures amounts to only a portion of the total damages Plaintiffs believe are available to the Class, as the analysis in *Lazy Oil, Co. v. Witco* makes clear, Courts routinely approve settlement amounts that represent only a fraction of the damages that could theoretically be recovered by the Class.

**B.     Additional Factors from *In re Prudential* and *In re Baby Products* Support the Settlement.**

In addition to the *Girsh* factors described above, the Third Circuit has in recent years identified further factors that may be pertinent to a Court's assessment of the fairness, reasonableness, and adequacy of the Class Settlement.  In *In re Prudential Insurance Co. America Sales Practice Litigation*, 148 F.3d 283 (3d Cir. 1998), the Third Circuit found that the following factors may be relevant:

> [T]he maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

*In re Prudential*, 148 F.3d at 323.  The Third Circuit has described these factors as "permissive" and "non-exclusive."  *In re Baby Products Antitrust Litig.*, 708 F.3d 163, 174 (3d Cir. 2013).  To the extent these factors have not been addressed above, some additional information may be pertinent that weighs in favor of approving the settlement.  First, all members of the General Class and Sub-Classes were given an opportunity to opt out, and were informed of that right and the applicable procedures in the Class Settlement notice.  Second, the attorneys' fees and expenses provisions in the settlement are reasonable.  As explained in further detail via separate motion, the arbitration panel will determine the appropriate attorneys' fee award within a range deemed fair adequate and reasonable by this Court, but Class Counsel agreed prior to the dissemination of the settlement notice to limit the request to a fee award of no more than 35% of the final settlement amount.  This percentage is reasonable when compared to fee awards in similar case, particularly

given how long this case has been pending (15 years) and the substantial time, effort and expenses expended by Class Counsel.  Further, the percentage awarded will based only off of the actual cash value of the final settlement amount, and not off of any unclaimed funds, coupon values, or other non-cash values. Finally, there is no requirement that members of the General Class and Sub-Classes submit claim forms, and all available funds will be directly distributed to members of the General Class and Sub-Classes to the extent possible using Class Counsel's best efforts.

The *In re Baby Products* court also added an additional line of inquiry for district courts to consider:

> [O]ne of the additional inquiries for a thorough analysis of settlement terms is the degree of direct benefit provided to the class. In making this determination, a district court may consider, among other things, the number of individual awards compared to both the number of claims and the estimated number of class members, the size of the individual awards compared to claimants' estimated damages, and the claims process used to determine individual awards. Barring sufficient justification, cy pres awards should generally represent a small percentage of total settlement funds.

*Id.*

These inquiries, applied here, further illustrate that this settlement is fair, reasonable and adequate and should be approved.  Depending on the result of the Arbitration, the final settlement amount will either be $24 million or $70 million.  The borrowers listed on 26,698 loans (typically either one or two people per loan) are within the class definition.  Class Counsel has estimated that if its fee and expense requests are awarded in full, the settlements for individual borrowers would average approximately $565 or $1,685 per loan, depending on which amount the Panel chooses. In either case, all distributions to members of the General Class and Sub-Classes will be made in cash, with no coupons, and no portion of the settlement fund will revert to PNC.  Class Counsel will undertake best efforts to ensure direct distribution of the funds to all members of the General Class and Sub-Classes, and *cy pres* distribution will only be utilized to the extent that money

remains in the fund beyond the point at which locating unpaid Class Members or redistributing leftover funds becomes uneconomical. Class Counsel believes that only a small percentage of the final settlement amount, if any, will be distributed *cy pres*.

## IV.   CONCLUSION

In light of the foregoing, Plaintiffs respectfully submit that the proposed settlement is fair, reasonable and adequate and represents an appropriate compromise of this litigation. Therefore, Plaintiffs request that the Court approve the proposed settlement and refer this case to the Arbitration Panel for determination of the final remaining issues. A Proposed Final Order Pursuant to Fed. R. Civ. P. 23 Granting Final Approval of Class Action Settlement is attached hereto as **Exhibit 12**.


Dated: December 8, 2016                     Respectfully submitted,

By  */s/ R. Frederick Walters*
    R. Frederick Walters
    J. Michael Vaughan
    David M. Skeens
    Garrett M. Hodes
WALTERS BENDER STROHBEHN & VAUGHAN, P.C.
*–Co-Lead Class Counsel*
2500 City Center Square
1100 Main
Kansas City, Missouri 64105
(816) 421-6620
(816) 421-4747 (Facsimile)


By  */s/ R. Bruce Carlson*
    R. Bruce Carlson (PA ID #56657)
    Gary F. Lynch
    Jamisen A. Etzel
CARLSON LYNCH SWEET KILPELA & CARPENTER, LLP
*–Co-Lead Class Counsel*
1133 Penn Ave., 5th Floor

Pittsburgh, Pennsylvania 15222
(412) 322-9243
(412) 231-0246 (Facsimile)
bcarlson@carlsonlynch.com

**_Counsel for Plaintiffs and Class Counsel_**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the within Motion was served upon all counsel of record by the Court's ECF Filing System this 8th day of December, 2016.

 _/s/ R. Frederick Walters_

25